## Case No. 15,686.

### UNITED STATES v. McKEE.

[3 Dill. 551;[1] 3 Cent. Law J. 95.]

Circuit Court, E. D. Missouri. Jan. 31, 1876.

INTERNAL REVENUE—CONSPIRACY TO DEFRAUD THE GOVERNMENT.

1. The extent and nature of the conspiracy formed in 1871 and continuing until 1875, in the city of St. Louis, to defraud the government out of the tax levied upon the production of distilled spirits, stated.

2. When and for what purpose the declarations of a conspirator can be admitted in evi-

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

dence against the defendant, on an indictment charging him with complicity in the conspiracy.

3. The substance of the testimony relied on by the government to show the defendant's connection with the conspiracy, stated.

4. The weight due in the law to the testimony of confessed conspirators and accomplices, stated; and the rules of law laid down in respect to the power of juries to convict on such testimony when not corroborated.

5. The defendant's previous good character; for what purpose it is to be considered by the jury, and to what extent available to the defendant.

6. What constitutes a reasonable doubt in a criminal case defined.

[This was an indictment against William M'Kee upon the charge of conspiring to defraud the government, under section 5440 of the Revised Statutes. See Case No. 15,-685.]

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge (charging jury). The unwearied attention you have given to the testimony, throughout this protracted trial, gives the court such assurance that you thoroughly appreciate the solemn public duty which, as citizens, you have been involuntarily required to discharge, that we feel it to be wholly unnecessary to impress you with the importance, alike to the government and to the defendant, of the issues committed to your decision. We proceed at once, therefore, to lay before you the legal principles applicable to the ultimate question that you are to decide, which is, whether the defendant at the bar of the court is guilty or not guilty of the offence charged against him in the indictment.

In legal investigations precision is necessary, and hence it is essential that you should first understand what is the exact offense which the government charges upon the defendant. It is, in substance, that the defendant entered into a conspiracy with certain distillers and internal revenue officers in the city of St. Louis to defraud the government out of the taxes which the law imposes, for the purpose of revenue, upon the production of distilled spirits. A large portion of the internal revenues of the government is derived from this source, and experience has shown, gentlemen, how general are the attempts made to evade this tax and to defeat the equal and full operation of the laws which impose it.

Revenue laws, though absolutely necessary, are often unpopular; but it is, perhaps, true, that in no other way can so much revenue be derived with so little general pressure from the burden, as from a duty laid on the manufacture of distilled spirits. Taught by the experience of other countries, as well as by our own experience in this regard, the congress of the United States, in order to insure the full collection of this

tax, and to prevent fraudulent evasions of it, has found it necessary to provide a complicated system of checks and safe-guards. The circumstances of the present case do not make it necessary to point out in detail these checks or to describe their operations. It is sufficient to say that the law does not trust to the distiller, but appoints its own agents or officers to watch every material step in the production of distilled spirits, from the purchase of the grain to the final payment of the tax. Confidence and power must from necessity be reposed somewhere; and the law confides in the officers of its own appointment to see that its requirements are not evaded. It also requires regular reports, under oath, from the distiller and rectifier. The checks provided by the law are so complete and perfect that frauds cannot be committed if the revenue officers are faithful and honest. It hence results that any general scheme to defraud the government of this tax, to be successful, must involve a combination, or, in legal language, a conspiracy between the distiller and the rectifier on the one hand, and the government store-keeper, gauger and other internal revenue officers on the other.

Such a conspiracy is substantially charged in the indictment, and it is not a disputed fact in the case, upon the concessions of counsel, that such a conspiracy has been proved to exist. The defendant's counsel concede it and have vied with the counsel for the government in portraying to you its magnitude, and in condemning its actors and operations, the only point in dispute in this respect being, whether the defendant was a member of the conspiracy.

As affecting the application of certain legal principles, hereafter to be mentioned, touching the effect to be given, as respects the defendant, to the acts and declarations of those who are admitted and proved to be conspirators, it is pertinent in this place to call your attention, in a general way, to the nature of the conspiracy shown in this case.

According to the testimony, this conspiracy originated in September, 1871, and with a brief interval in the fall of 1872, and the early part of 1873, continued until May, 1875, when the distilleries were seized and afterwards many of the conspirators arrested and indicted. Some of the conspirators have been convicted, and others have pleaded guilty, and the property of some of the distillers and rectifiers has since been condemned as forfeited to the United States. A shameful feature in the conspiracy is that it seems to have originated not with the distillers and rectifiers but with the revenue agents of the government. Mr. Megrue testifies that he came here in September, 1871, at the instance of John A. Joyce, a revenue agent, to take charge of the illegal organization; that the distillers who first went into it were Bevis & Fraser, Macklot Thompson,

and Peter Curran. In 1872 Ulrici, who had first refused to enter it, and who continued to refuse until he saw his business being ruined by his inability to make "straight" compete with "crooked" whiskey, joined the conspiracy. Afterwards other distillers—Teuscher, Busby, and the Bingham Bros.—became members of the illegal organization.

The tax on proof spirits was then 70 cents per gallon, and the agreement was that this tax should, as far as possible, be systematically evaded by removing the spirits from the government warehouse without the payment of the tax, by undermarking the real proof and by the removal and re-use of stamps once used before. One-half of these illicit gains, about 35 cents per gallon, was to be retained by the distiller for his share, and the other 35 cents per gallon was to be received and retained by the revenue officers or other conspirators for their share of the unlawful profits.

These collections from the distillers were made with systematic and business like regularity, every Saturday, when the distilleries were in operation. The ring had its collector and its disburser. The first collector was Megrue; he had an office for the transaction of that business; he remained with the organization until the fall of 1872, collecting for himself and for his confederates from the four distilleries named, on an average, as he states, of about $2,500 per week. Some idea of the magnitude of the fraud may be formed from the fact that Megrue admits that his one-fifth of less than one-half, amounted, in about fourteen months, to the sum of $50,000 or $60,000, showing that during that period the government was defrauded at these four distilleries of from $600,000 to $800,000. Peter Curran states that he, on his own account, paid to the different collectors of the ring from the first to the last about $60,000 or $70,000. From June, 1873, to August, 1874, Fitzroy was the collector for the ring; then Everest, and others. There can be no doubt that from 1871 to 1875 the government was defrauded by this conspiracy in the single city of St. Louis of revenues to the extent of millions of dollars. No honest distiller who paid the tax upon his productions could continue in business in competition with the dishonest who were systematically evading the tax.

It seems astonishing that a conspiracy so enormous in its proportions, and which was depleting the revenue of such vast sums, should so long remain undiscovered by the uncorrupted officers of the government. Some explanation of this is found, however, in the testimony in this case. At different times revenue agents were sent here or visited here; and it is painful to see that the large resources of the conspirators were sufficient to corrupt many of these in their turn. In 1872, Brashear, a revenue agent, visited this place; $5,000 were raised by

Megrue and paid to him, and that came all from Bevis. In 1873, $10,000 were raised from the distillers and paid to the same agent with the knowledge and consent of McDonald, the supervisor of internal revenue, and of Joyce, the revenue agent, for a false report as to the condition of the distilleries in this city. In 1874, $10,000 were raised and paid to Hogue, another revenue agent, for a like purpose.

In the spring of 1875, $10,000 were raised by the distillers and given to McDonald to be used as a corruption fund in Washington, to stop threatened proceedings. But this was unavailing, and the apprehended seizures and arrests were made. In every instance knowledge of the visits of the government agents and detectives seems in some way to have been discovered by the conspirators, in time to enable the distillers to "straighten up" before the official visitation was made. There is every reason to believe, without going beyond the testimony in this case, that the conspiracy here was not an isolated one, but only a link in a chain of frauds of like character in many states, thus enabling the leading conspirators in different places to co-operate with each other in ways and means to avoid detection and escape punishment.

These considerations serve to explain why it was that the conspiracy here in St. Louis continued so long in existence unknown to the government and the officers who were incorruptible, or high enough in place to strike at it with effect. The extent of this conspiracy and its continuous character and operations has an influence in determining the legal principles which we shall hereafter state, as those which belong to this case, and should not be overlooked by the jury in considering the evidence. It is for this purpose that allusion is made to it, and not for the purpose, gentlemen, of exciting your just indignation and shame that such things could be.

Of course, the government on discovering the conspiracy, was bound to lay its strong arm upon it, to arrest and bring the guilty to justice, and this is the work and the duty of courts and juries.

But the government sustains a relation and owes a duty to its citizens as well as to its revenues, and its interests do not demand, and will not be promoted by the conviction of any one who is not proved, in the manner required by the rules of law, to be guilty of the offence imputed to him. And so, gentlemen, you must come to a dispassionate consideration of this case, recollecting that the court, and the jury as a part of the court, have but one duty to discharge, but one object to attain, and that is to ascertain the truth, and to do justice with absolute impartiality and fearless independence.

It is well known that the attention of the country has been drawn to these frauds, and the occurrences which have taken place under your eyes during the trial show the warm public interest in these cases.

We feel it to be our duty to say, that while the indignation of every right-minded citizen is justly excited against the real perpetrators of these frauds, the jury should be especially on their guard that this should not over-master, or in any way, or in the least degree, influence their judgment, in deciding the only issue before them, and that is whether the defendant was, and is fully proved to have been, a member of the conspiracy. But in proportion to the extent of the indignation, may be the danger, if the jury are not sedulously on their guard, of including in the list of the guilty, persons named in connection with these frauds, but whose connection remains to be established in the manner and to the extent required by the law in all criminal cases.

It is just as much the duty of the jury to acquit the innocent, as to convict those proved to be guilty.

The existence of a conspiracy in St. Louis being admitted by defendant's counsel, this narrows your enquiry to a single question of fact, and that is, was the defendant one of the conspirators?

Megrue, McDonald, Joyce, Fitzroy, Thorpe, Engelke, Barton, Cancannon, Findlay Robb, Leavenworth, Bevis & Fraser, Curran, Ulrici, and others here not named, are admitted to have been in the conspiracy; the question recurs whether the defendant was a member of this conspiracy? The government affirms it, and must prove it by legal evidence, in order to ask a verdict in its favor. The case of the defendant is peculiar. He was not engaged in the manufacture of distilled spirits. He was not in any manner connected with the revenue service as an officer or agent. The theory of the government is that he was sought out by the originators of the conspiracy by reason of his controlling power in a newspaper of extensive circulation and influence, and his ability to assist, and if need be, to protect the conspirators in case of trouble.

The government seeks to connect the defendant with the conspiracy by reason of his alleged receipt from week to week of a share of the illicit gains of the conspirators; no other motive is shown for his alleged membership in the conspiracy, and it is quite impossible to suppose he was a member unless he was such for the purpose of pecuniary gain. Accordingly the government has assumed the burden of showing the defendant's connection with the conspiracy by undertaking to prove that he did receive a share of the stolen tax, and really the material question upon the evidence is whether the government has shown this to the satisfaction of the jury, with the degree of positiveness required in criminal cases.

Megrue testified that when he received each Saturday from the distillers his half of

the illicit gains for the week, that after setting apart a certain portion for the storekeeper, for the deputy collector, and for the assessor, and some for the others, the rest of the money was divided each week into five equal parts, one-fifth for McDonald, one-fifth for Joyce, one-fifth for the witness Megrue. and two-fifths, by direction of Joyce, he put into a package or packages, and delivered to John Leavenworth, a gauger (since deceased), each week, with directions to deliver to Ford, the collector, and to McKee.

Megrue says this was done invariably while he was the ring collector, from September, 1871, to the fall of 1872.

Whether Leavenworth ever delivered the packages to Ford or to McKee, the witness Megrue has no personal knowledge, and does not testify.

Fitzroy testifies that when he became collector for the ring he set apart each week a portion for McKee and Ford, until the death of the latter, when the division was in four equal parts instead of five. Bevis, one of the fraudulent distillers, testified that when he paid money to Megrue, he understood from him that it was to go to Joyce, McDonald, McKee and Ford, but he does not know of his own knowledge how it was distributed, or whether any of it came to the hands of McKee and Ford. The other distillers gave no testimony on the point for whom they paid the money or whether it was delivered or not.

Leavenworth reported to Megrue, as the latter swears, when subsequently receiving packages, that he had distributed or delivered to McKee and Ford the packages previously received for them.

But, as we instructed you on the trial, and now repeat, such declarations, that is, the declarations of Leavenworth to Megrue, when he went back for money, from week to week, such declarations, while they are competent evidence to show the relations of Megrue and Leavenworth to each other, and to the transaction, and to explain the act of receiving money from week to week, they are not competent to establish the fact that the defendant, McKee, did receive the money, but such fact (which, under the circumstances of this case, is equivalent to connecting him with the conspiracy) must be shown by evidence other than the mere declarations and statements of a confessed conspirator, not made to or in the presence of the defendant.

This is a rule of universal application, and the law on this subject may be here appropriately stated. When a conspiracy is shown to exist, the rule of law is that all acts done in furtherance of the conspiracy by any of the conspirators, though not in the presence of the others, and all declarations made by any of the conspirators to advance the common cause, or in connection with acts done in promotion of the conspiracy, though not made in the presence of the other conspirators, are evidence against all the conspirators. One conspirator in such cases is bound by all the acts and declarations of his fellow conspirators done and made to promote the common object; but mere declarations, that is, statements of real conspirators, that some one else is a member of the conspiracy, is not evidence to establish that fact; it must be established by independent evidence of the acts, conduct or admissions of the person himself, who is sought to be implicated; but if it is, by such other independent evidence, once established to the satisfaction of the jury that a person is a member of a conspiracy, then the rule above stated applies, and he is bound by the acts and declarations of his co-conspirators, done and made in furtherance of the illegal scheme, though not done or made in his presence. This distinction is plain enough, and when once clearly apprehended by the jury, not difficult of application. I think, gentlemen, that after what I said to you on the trial, and what I have said now, you appreciate that distinction. It is important to bear that in mind, and I hope I have made it perfectly clear.

To establish the defendant's connection with the conspiracy the government relies chiefly upon the testimony of the following witnesses: First, Megrue, as to an alleged interview with McKee in 1875, at the Lindell Hotel, the circumstances of which need not be here stated, as they have been fully rehearsed by the counsel on both sides, and are doubtless fresh in your minds. That an interview of some character took place at the Lindell Hotel does not seem to be denied; but the circumstances under which it occurred and what was said and done are matters in dispute, and for you to determine upon the evidence after settling the credit to be given to the witnesses who speak upon the point. Second, upon the testimony of Fitzroy, particularly that portion of it in which he testifies to the payment of the sum of $480 to McKee by Joyce and McDonald, in the presence of the witness, in October or November, 1873, and his subsequently making a memorandum of the amount.

This is important testimony. because, if true, in the breadth of the statement of the witness, it tends directly to connect the defendant with the conspiracy. It is claimed by the defendant that this testimony is utterly unworthy of credit by the jury, because Fitzroy is a confessed conspirator, because it is improbable that McKee would have made the remark in the manner imputed to him by the witness. because the witness has been shown by Walsh to have a spite against the defendant. because he is a confessed conspirator, under indictment for alleged perjuries in connection with these frauds, and because of his statements. claimed to be contradictory. in his testimony delivered before you. We shall hereafter speak of the credit due to the evidence of an accomplice, but in this

connection will observe generally that really, ultimately, it is solely a question for you to determine, whether, under the circumstances, you can safely place reliance upon such testimony. Reliance is also placed, by the government, to connect the defendant with the conspiracy, upon the testimony of Bernard H. Engelke, one of the conspirators, particularly upon that portion of his testimony in which he details an interview held, as he says, at the instance of one Hardaway (also one of the conspirators) with McKee, in or about October, 1873. If that conversation occurred substantially as Engelke testifies, it would tend to inculpate the defendant in the conspiracy charged against him.

It is claimed by the defendant that this testimony also is unworthy of credence, not only because Engelke is an accomplice, but especially because he has been contradicted on this point by the evidence of Louis Bohle, and by the evidence of Hardaway, and by an official letter of Megrue's, dated August 20, 1874, in reference to the seizure of spirits in Colorado. On the other hand, the government claims that Engelke is corroborated on this point by Barton, one of the conspirators, and what afterwards took place in connection with the Busby distillery; and that Hardaway is contradicted, to some extent, by the book-keeper of Engelke. That is what the government claims. There is much conflict in the evidence upon this subject. The only thing that seems to be agreed on is that for some reason, for some object, Engelke went once, and but once, to see McKee. When, for what purpose, and what was said then—these are matters of fact for you to decide, bearing in mind that Engelke states that he went to see McKee but once in connection with these matters. Reliance is also placed by the government on the testimony of Sehon D. Thorpe, one of the conspirators, to connect the defendant with the conspiracy.

Without detailing them, it is sufficient to remark that Thorpe testifies to conversations with McKee, and as to arranging an interview between McKee and Megrue, which if true, as Thorpe states them, might imply (that will be for you to decide) on the defendant's part a connection with the conspiracy.

And here, again, the main question is one which exclusively belongs to the jury, viz.: The credit to be given to the evidence of Thorpe, who is not only a conspirator under the indictment, but who admitted on the witness stand that he had prevaricated, if not indeed sworn falsely, before the grand jury when he was first before it, and was asked if he knew of any whiskey being removed from the distilleries without the tax being paid on it, and that he replied "No;" whereas, he knew the contrary, at least in the sense of the enquiry, as he knew it was meant to be made. Reliance is also placed by the government to connect the defendant with the conspiracy upon the testimony of Bevis, in which he claims to have had an

interview with McKee touching the danger from the removal of the Hardaways from office and also a conversation with McKee during the session of the grand jury, as to the benefit that might enure to those who were or might be indicted if he, the defendant, were not indicted.

Reliance is further placed by the government upon the testimony of Peter Curran touching an alleged interview with McKee, and the exhibition to him of so-called ring checks, wherein he stated that, unless certain revenue suits pending against him were arranged, he would make trouble, and to which, he alleges, McKee replied: "These" (referring to the checks), "are dangerous documents," and left him (Curran) to infer that he would aid him in the said suits as desired.

To connect the defendant with the conspiracy, reliance is placed by the government upon the testimony of Cancannon, a confessed conspirator; particularly in relation to the letter said by Cancannon to have been written by the defendant to Findlay Robb—gauger at Bevis & Fraser's distillery—during the visit of Gen. Sewell, a revenue agent, and to the testimony of the young men Bucher and Bevis, in connection therewith.

Such, gentlemen, is the volume of the testimony on the part of the United States, except the brief and casual conversation with Merrill, adduced to prove the defendant's guilty participation in the conspiracy. It will be observed that, with the exception of Merrill and young Bucher, the witnesses of the government were all members of the conspiracy. As to the testimony of conspirators, the rule of law is that they are competent witnesses. That means that either party has the right to compel them to be sworn. It also implies that when sworn you shall consider their testimony. They are competent witnesses, and under the legislation of congress they are compelled to testify. The testimony of conspirators is always to be received with extreme caution, and weighed and scrutinized with great care by the jury, who should not convict upon it unsupported, unless it produces in their minds the fullest and most positive conviction of its truth. It is just and proper in such cases for the jury to seek for corroborating facts in material respects. It is just and proper to do it. It is not absolutely necessary. To establish a conspiracy, or a person's connection therewith, it is competent to do so not only by direct testimony, but by facts and circumstances which produce a clear and positive conviction.

If any of the witnesses are shown knowingly to have testified falsely—knowingly to have testified falsely on this trial or before the grand jury touching matters here involved—this jury are at liberty to reject the whole of their testimony on the trial of this case. To the jury exclusively belongs the duty of weighing the evidence, and ultimately this case comes down to that, gentlemen of the jury. The question for you,

under these rules of law, to decide upon this testimony, is peculiarly, exclusively, and emphatically a question for the jury, and the most delicate duty which you have to perform in this case will be to settle the credit to be given, if any, to the testimony of these witnesses. That the law commits to your judgment and conscience.

To the jury exclusively belongs the duty of weighing the evidence and determining the credibility of the witnesses. With that the court has absolutely nothing to do. The degree of credit due to a witness should be determined by his character and conduct, by his manner upon the stand, his relations to the controversy and to the parties—his hopes and his fears, his bias or impartiality, the reasonableness or otherwise of the statements he makes—the strength or weakness of his recollections, viewed in the light of all the other testimony, facts and circumstances in the case.

The defendant has produced an impressive array of witnesses of the highest character, who have testified to his previous uniform and general good reputation as a man of unquestioned integrity. This is competent evidence, and the good character of the defendant in this respect is a fact to be weighed and considered by the jury, in the light of which they should view all the evidence and determine the question of his innocence or guilt of the crime charged against him in the indictment.

The defendant, by the policy of our law, can neither be compelled nor permitted to testify. As a substitute for this deprivation, the burden to establish guilt is upon the government, and the law clothes the defendant with a presumption of innocence which attends and protects him until it is overcome by testimony which proves his guilt beyond a reasonable doubt—beyond a reasonable doubt; which means that the evidence of his guilt as charged must be clear, positive and abiding, fully satisfying the minds and consciences of the jury. It is not sufficient, in a criminal case, to justify a verdict of guilty, that there may be strong suspicions; or even strong probabilities of guilt; nor, as in civil cases, a preponderance of evidence in favor of the truth of the charges against the defendant; but what the law requires is proof, by legal and credible evidence of such a nature that, when it is all considered by the jury, giving to it its natural effect, they feel, when they have weighed and considered it all, a clear, undoubting and entirely satisfactory conviction of the defendant's guilt. This, and this only, is required; but this much is required. If the case is thus proved, the jury should convict; but if not, they should acquit.

The sense of duty faithfully and conscientiously discharged goes with us through life, and one of the recollections which never fails to give a deep and tranquil satisfaction, is the recollection of duty thus performed.

Gentlemen, our duty is at an end. Your most important duty here begins. The case is submitted to you.

The jury returned a verdict of guilty, and the defendant was sentenced to pay a fine of $10,000 and to two years' imprisonment.

[NOTE. The defendant moved for a new trial upon these grounds, viz.: (1) For disqualification on the part of one of the jurors. (2) The reception in evidence of certain declarations made by Leavenworth to Megrue. (3) Misconduct on the part of the jurors in reading certain newspaper articles concerning the trial. The court, after much consideration, denied the motion. Case No. 15,683. Subsequently the defendant moved in arrest of judgment, and to dismiss, which motions were overruled. Afterwards defendant was granted an unconditional pardon by the president, a copy of which he exhibited with his plea. See Id. 15,687. To these pleas the government demurred, which demurrer was finally overruled. Id. 15,688.