## MEANS et al. v. UNITED STATES.

(Circuit Court·of Appeals, Second Circuit. May 4, 1925.)

No. 289.

1. **Criminal law ☞371(1) — Testimony of transactions involving crimes other than those alleged in indictment, but part of conspiracy, held admissible.**

In prosecution under Cr. Code, § 37 (Comp. St. § 10201), for conspiracy to transport whisky contrary to National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), where accused explained various transactions on ground that it was part of work which he had undertaken as special investigator of prohibition situation, evidence of similar transactions not charged in indictment *held* admissible to show intent of accused.

2. **Criminal law ☞649(3)—Refusal of continuance because of illness of accused's counsel held not abuse of discretion.**

In prosecution for conspiracy, under Cr. Code, § 37 (Comp. St. § 10201), to transport whisky in violation of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), where accused was represented by two attorneys, and ten days after commencing taking of testimony his chief counsel announced that he was ill, refusal of adjournment and direction to other counsel to proceed with case *held* not abuse of discretion.

In Error to the District Court of the United States for the Southern District of New York.

Gaston B. Means and another were indicted and convicted of a violation of section 37 of the Criminal Code. Defendant Gaston B. Means sues out this writ. Affirmed.

Abraham I. Menin and Emanuel Harris, both of New York City, for plaintiff in error Gaston B. Means.

Emory R. Buckner, U. S. Atty., of New York City, and Hiram C. Todd and Clifford H. Byrnes, Sp. Asst. Attys. Gen., for the United States.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. After conviction, the plaintiff in error Means sued out this writ of error and alone seeks a review of the judgment rendered, convicting both defendants on an indictment charging them with violation of section 37 of the United States Criminal Code (Comp. St. § 10201). The indictment charges "that during the period of time from November 1, 1921, to December 31, 1922, there was a great quantity of intoxicating liquors, to wit, 50 barrels of Sam Thompson rye whisky, lying in the Sam Thompson Distillery warehouse at Brownsville, in the state of Pennsylvania, which could lawfully be withdrawn from said warehouse only under the restrictions and for the uses and purposes set forth in the laws of the United States, pertaining to that subject, and which could not lawfully be transported from said warehouse to any other place for use for beverage purposes," and that the defendants named "unlawfully and feloniously did conspire, combine, confederate, and agree together, with Charles W. Johnson and Jacob Stein who, by reason of the fact that they have testified before said grand jurors concerning the matters in this indictment charged, are not herein indicted, and with divers other persons to said grand jurors unknown, to commit offenses against the United States; that is to say, five offenses each consisting in said conspirators transporting a motor truck load of said whisky, from said warehouse to some private warehouse in the city of Pittsburgh, in said state of Pennsylvania, the name of which is to said grand jurors unknown, otherwise than as authorized by the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), that is to say, for use for beverage purposes."

The conspiracy is alleged to have been committed within the jurisdiction of the District Court for the Southern District of New York. There are eight overt acts alleged as committed to further the object of the conspiracy. In support of this indictment, the government offered evidence which was sufficient for the jury to find that Johnson in November, 1922, met Stein in the city of Washington, and the latter explained that he represented certain persons who would and could release whisky from bond in lots of less than 50 barrels for the consideration of $200 per barrel. Johnson went to Pittsburgh and consulted the owner of the certificates for the whisky desired to be released. He returned to Washington, was introduced by Stein to the defendant Jarnecke, who said he represented the plaintiff in error, and explained to Johnson the terms under which the plaintiff in error would undertake to release the whisky from bond. Johnson again went to Pittsburgh, and the owner of the certificates gave him 10 of them, each for 5 barrels of whisky stored in the Thompson Distillery, also a written calculation based on the number of gallons represented by the certificate computing the cost of obtaining the whisky at $6.40 per gallon, as previously explained by Jarnecke, and it was concluded that it would cost $15,097 to secure the whisky. On December 4, 1922, Johnson in Washington, met one Charles W. Storey who gave him $15,097.60 in currency, which had been given to him by the owner of the certificates when there. On the same day, Johnson met Jarnecke, who took him to see Means at a hotel in Washington. There they discussed the situation, and the plaintiff in error explained that by reason of his position as special agent of the Department of Justice, and his influence with the Commissioner of Internal Revenue he would be able to secure permits to release the whisky from bond. The plaintiff in error then directed Jarnecke to make a notation on a sheet of paper to the effect that the whisky would be moved to the Finch Distillery at Pittsburgh. The plaintiff in error admitted this in his testimony, but declared that such a writing was made and direction given so that the whisky might be legitimately moved to the Finch Distillery in Pittsburgh. Johnson, however, said that the name of the Finch Distillery was to be used simply for the purpose of obtaining withdrawal papers, and that the plaintiff in error said he could deliver the whisky at any private place designated by the owners where it could be used

for beverage purposes. It was thereupon agreed that, upon delivery of the whisky, plaintiff in error and Jarnecke were to be paid $200 per barrel. It was said the transfer of the whisky from one distillery to another might be lawfully made, but it would not necessitate a large payment of money to do so. Johnson and Jarnecke returned to the hotel, whereupon Johnson paid over the money, taking Jarnecke's receipt therefor, which was offered in evidence. The plaintiff in error telephoned to Jarnecke and said that he would have to have $5,097.60 to purchase revenue stamps. Johnson testified that he went directly to a hotel in Washington, where he paid this money to the plaintiff in error. Plaintiff in error agreed to move the whisky the following Saturday, and failed to do so, but met Johnson the following Tuesday at the hotel in Washington, where the situation was further discussed. Two days later, Johnson met the plaintiff in error and Jarnecke at a hotel in New York City, where the physical arrangements were completed to withdraw the whisky from bond on December 16, 1922. On the morning of that day, Johnson arrived in Pittsburgh with a representative of plaintiff in error, registered at a hotel, and remained until December 18th. The whisky was not moved, and apparently no effort was made by either the plaintiff in error or Jarnecke to do so.

In his defense, the plaintiff in error testified that he resigned his position as investigator of the Bureau of Investigation, Department of Justice, and began work directly under the President, making a complete investigation of the entire prohibition situation in the United States. He said that in July, 1922, the President wrote a letter to one Jesse Smith, authorizing him to conduct an investigation of the prohibition situation in the United States, and authorized him to use such other assistants as he might require. He said this letter was delivered to him as his authority to act in the premises, but failed to produce it upon the trial, and excused such failure, saying it was taken from him on March 21, 1924, when persons representing themselves to be deputy marshals of the United States Senate demanded it.

[1] Evidence was admitted, over objection and exception, of the plaintiff in error to similar transactions, which were not charged in the indictment. A witness testified that he represented the Valdona Drug Company, which desired a permit to use intoxicating liquors for the manufacture of

6 F.(2d)—62

medicinal preparations, and that in November, 1922, they paid both of the defendants named in the indictment, $8,000 upon their promise to expedite the issuance of such permit, and that it was never issued. Other testimony was given that Stein, one of the conspirators named in the indictment, brought one Goldberg to Washington and there met Jarnecke in January or February, 1923, that this person had some whisky at the Meadville Distillery in Pennsylvania and wanted the barrels removed, and that later Goldberg met the plaintiff in error and gave him $5,200 for the transfer of the whisky from this distillery. Further testimony was offered to the effect that one Haimowitz met Jarnecke and the plaintiff in error through Stein, and arrangements were made for the removal of whisky belonging to him for $200 a barrel, and that Haimowitz deposited $10,000 with Jarnecke for removing 100 barrels from a distillery in Baltimore, which money was later given to the plaintiff in error; also that one Steinfeld deposited $5,000 with the plaintiff in error and Jarnecke to remove 1,200 cases of whisky in New York. Stein further testified that one Albrecht met the plaintiff in error in Washington and gave $1,550 between the 15th and 20th of December for the removal of some cases of liquor stored in the federal distillery in Baltimore. Another witness was permitted to testify that in January, 1922, he gave $5,000 to Jarneke in connection with another whisky transaction.

Error is assigned in the admission of this testimony, and it is urged that this testimony was irrelevant. These transactions occurred during the period mentioned in the indictment when, it is alleged, the conspiracy was formed in the Johnson transaction, and which is the subject of the indictment. They showed the general relationship between Stein, Jarnecke, and the plaintiff in error at the time of the conspiracy, and the character of that relationship indicated a course of fraud that was entered into and carried on during the period. It was a part of the general design and conspiracy to unlawfully obtain the release of whisky from distilleries for any one who would seek and obtain the assistance of the plaintiff in error and his coconspirators. It pointed out their relationship, association, and conduct and therefore their opportunity for conspiring (Heike v. United States, 227 U. S. 131, 33 S. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128; Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278). Proof of the

design makes more probable the commission of the act charged, for it shows a natural consequence of harboring the design. The plaintiff in error took the stand in his own behalf and testified that he resigned his position as investigator for the Bureau of Investigation of the Department of Justice, and began work under the President to make a complete investigation of the entire prohibition situation in the United States, and explained his contact with and relation to the various transactions on the ground that this was part of the work he had undertaken in making such investigation. He therefore presented the issue of whether what he did was an honest effort to fulfill his alleged employment as special investigator, or whether what he did was in fact done with a criminal intent. Whether he was engaged in fraudulent transactions and had hatched a conspiracy, and therefore violated section 37, depended upon the intent with which he carried on these transactions, if he did so. That question was for the jury's determination. With this question of intent tendered, the defendant in error was permitted to introduce evidence of other similar acts of the parties of a kindred character in order to illustrate and establish their intent or motive in the particular act charged in the indictment. Wood v. United States, 41 U. S. (16 Pet.) 342, 10 L. Ed. 987.

In the Wood Case, the court said: "Indeed in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act, taken by itself, may not be decisive either way; but when taken in connection with others of the like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

In Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278, the charge was a conspiracy to suborn perjury in connection with obtaining public lands of the United States. Evidence was admitted of similar offenses committed by the defendants with respect to certain school lands, the property of the state.

The court below charged the jury that "these matters" (other transactions referred to) "tend to show that money was paid to the defendants under like and similar conditions, as was the money paid to them by Johnson, and the evidence touching them is competent for your consideration for one purpose only, namely, that of determining with what motive, intent, and purpose the defendants engaged, if at all, in the transactions charged against them in the indictment touching which there has been much testimony adduced at the trial for your consideration. You should therefore not consider the evidence alluded to for any other purpose whatever."

This indicates the restriction placed upon the use of the testimony by the jury. We considered the question of admission of similar acts in Workin et al. v. United States, 260 F. 137, 171 C. C. A. 173. There the indictment charged a conspiracy to violate the Harrison Act (Comp. St. §§ 6287g–6287q), commencing January 1, 1917, and ending with the filing of the indictment February 20, 1918. The defendants there used a drug stor, and a doctor in the rear, who maintained an office there, prescribed for drug addicts. One doctor was succeeded by another, and evidence was allowed to show the transactions with each doctor. There was a separate indictment dealing with the transactions in which the second doctor was engaged. Objection was taken to testimony showing the purchase of drugs under the prescription of the second doctor, and this was assigned as error on appeal. We held that there was a continuing conspiracy down to the date of the indictment, and the defendants' actions co-operating with both doctors was admissible, and we held the second transaction admissible, and said: "Further, the rule of evidence is well settled that as to similar facts the commission of one act may not be proved by the commission of other similar acts, but to this rule there is the exception that in certain cases evidence of similar facts may be introduced to prove, not the commission of an act, but that there was a criminal intent. By evidence indicating the relations of the plaintiff in error with Dr. Booth, the government did not seek to prove that they sold heroin on the date charged in second count of the indictment, and the government was well within its rights in introducing this evidence for the purpose of showing that then the plaintiffs in error sold heroin on the date charged in the indictment; that they did so, not innocently or through mistake, but with knowledge and intent to violate the law. To show guilty knowledge and intent it is permissible to show that before and after the date on which the specific act charged was committed the plaintiffs in error sold drugs to others."

In Parker v. United States, 203 F. 950, 122 C. C. A. 252, this court held that, when

intent as to other offenses is clearly interwoven, it is admissible. In Farmer v. United States, 223 F. 903, 139 C. C. A. 341, the charge was under section 37 to commit a violation of section 215 of the Criminal Code (Comp. St. §§ 10201, 10385), and we held that instances of fraud of exactly the same sort as those charged in the indictment committed by one or more of the defendants were admissible to show intent. And we pointed out that there was nothing in Marshall v. United States, 197 F. 511, 117 C. C. A. 65, relied upon by the plaintiff in error, to the contrary. It was pointed out in the Marshall Case that a single sale of a single book, even at an exorbitant price might not necessarily satisfy one that there was an intent to defraud, but that repeated similar transactions might well demonstrate an intention to conduct a swindling enterprise. Reliance is placed by the plaintiff in error on the case of Boyd v. United States, 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077. The charge there was murder committed while engaged in a robbery. Evidence of similar robberies was admitted, and this was held to be error. The evidence was not admissible, for the murder and its intent were entirely distinct and separate from the other robberies committed on other occasions. In Wolf v. United States (C. C. A.) 290 F. 738, the defendant was convicted of knowingly receiving and possessing stolen goods. Evidence of the commission of another crime of similar character was held to have been erroneously received. There the other offense was remote, and had no bearing on the question of intent to commit the crime charged. In Fish v. United States, 215 F. 544, 132 C. C. A. 56, L. R. A. 1915A, 809, the charge was burning a yacht with intent to prejudice the insurer. Evidence of other fires was held to be improperly received. Such evidence was irrelevant, and of course prejudicial. In Hall v. United States, 235 F. 869, 149 C. C. A. 181, the defendant was convicted of an unlawful assault. A similar assault committed upon a person three years before the trial was held to be incompetent and improperly received. This, of course, was remote, and did not bear upon the criminal intent. We think this evidence was properly received, and find no error in its admission.

[2] It is further urged that error was committed at the trial in refusing to grant to trial counsel for the plaintiff in error a continuance or adjournment on account of illness with which he was stricken during the course of the trial. It appears that from the outset of the trial, the plaintiff in error was represented by two trial counsel, both of whom participated in the trial. The taking of testimony commenced on June 16, 1924, and on June 26, 1924, chief counsel for plaintiff in error announced that he was ill and requested an adjournment until Monday, whereupon the trial judge announced that because of his engagements he was obliged to leave on Monday, the 7th of July, and regretted that he was unable to grant the adjournment asked. He directed, however, that the other counsel continue, and granted an adjournment until the next day, whereupon the assisting counsel announced: "Well, I don't feel like assuming the responsibility of it. I just wanted to let the court know my position. The Court: Well, I will have to direct that you go on with the case." The next morning when court convened, counsel again announced that it was impossible for him to go on with the trial; that he had been unable to confer with his associate, and read an affidavit as to his associate's condition. Colloquy between court and counsel ensued, and counsel was directed to proceed with the case the following Monday. The trial counsel was in court, and upon this direction left the courtroom, and his assistant conducted the case until the end. It is urged that this was an abuse of discretion, and that error was committed in failing to grant a further continuance. The denial of this application was in the exercise of discretion vested in the trial judge, which we will not sustain as an error. The direction to proceed was proper.

We have examined the testimony and other errors assigned, but which were not argued, and are satisfied that the evidence presented questions of fact as to guilt for the jury's consideration, and no sustainable exception appears.

Judgment affirmed.