## MINNER v. UNITED STATES.
### No. 552.

Circuit Court of Appeals, Tenth Circuit.
March 29, 1932.

Thos. F. Doran and Harry W. Colmery, both of Topeka, Kan. (Doran, Kline, Colmery & Cosgrove, of Topeka, Kan., and Carl Van Riper, of Dodge City, Kan., on the brief), for appellant.

Dan. B. Cowie, Asst. U. S. Atty., of Topeka, Kan. (S. M. Brewster, U. S. Atty., of Topeka, Kan., on the brief), for the United States.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Minner and certain other defendants were charged by indictment with conspiracy to violate the National Prohibition Act. (See note 1.)

---

[1] The indictment charged that in Sedgwick county, Kansas, from about February 15, 1930, to May 12, 1930, Everett C. Minner, Marcus Gorges, William Norton, George "Goldie" Nelson, and certain other named defendants unlawfully conspired and agreed to unlawfully manufacture, possess, transport, and sell intoxicating liquor.

It further alleged it was agreed that in the execution of such conspiracy Gorges, Nelson, Norton,

At the first trial, Gorges, Nelson, Norton, and fourteen other defendants were convicted, and the jury disagreed as to Minner and five other defendants. A severance was granted to certain defendants. Minner was then tried alone, convicted, and sentenced to imprisonment for two years and to pay a fine of $10,000. He has appealed.

The testimony on the part of the government tended to establish the following facts: Madden was assistant prohibition administrator for the state of Kansas. Norton saw Minner in November, 1929, at the latter's office in Dodge City, Kansas, and stated he knew a man who was willing to pay Madden $2,000 a month for protection. Norton was acting for Gorges. Shortly thereafter Madden came to Minner's office and Minner told Madden that a man had been in his office who wanted to operate some stills in Reno and Sedgwick counties, and that the man thought Madden was a dangerous man and was willing to pay him $2,000 a month. Madden asked him if the full amount was for them and Minner said it was. Madden reported the conversation to Col. George H. Wark, his superior. Further conferences took place between Minner and Norton, and Minner and Madden. Arrangements were finally made for a meeting between Minner, Gorges, and Madden to be held at Minner's office on February 14, 1930. Madden and

Gorges were in different rooms and did not see each other. Negotiations were carried on through Minner. Gorges made two proposals: One that Madden let him collect for stills in Reno and Sedgwick counties, and the other that Madden "tip" Gorges off when the prohibition authorities were to make raids in those counties, both of which Madden rejected. Madden proposed that if Gorges would advise him as to the locations of his stills, he would keep prohibition agents under him away from them. Gorges accepted this proposition and agreed to pay $1,200 to cover the period from that date to April 1, and $1,200 monthly thereafter until January 1, 1931. Two hundred dollars of such payments were to go to Minner and $1,000 to Madden. Gorges paid Minner $1,200, and the latter in turn gave $1,000 thereof to Madden. Gorges was not then operating and he advised Minner that it would take him about two weeks to secure still locations and to start operations. Gorges agreed to send Minner a list of such locations. This he did in the latter part of February, 1930. Gorges changed some of his still locations and on April 1 he gave Minner two lists. One gave the then locations of six stills belonging to Gorges. The other the locations of four places which Gorges wanted the officers to raid. Minner turned these lists over to Madden. Three payments of $1,200 each were made by Gorges to Minner at the latter's office on February 14, April 1, and May 1. Minner retained $200 out of each of such payments and gave the remainder to Madden, who in turn gave such amounts to Wark. Max Mollenger had a one-third interest with Gorges in one of the stills and contributed a portion of the money paid to Minner. Gorges and certain of his associates were engaged in the manufacture, transportation, and sale of intoxicating liquor in Sedgwick county from about March 1 to about May 12, 1930.

Nelson testified that he introduced Norton to Minner at the latter's office in 1928.

Norton testified to the following: He first met Minner at the latter's office at Dodge City in August, 1928. Minner was then county attorney of Ford county, Kansas. After some conversation he agreed to pay Minner $200 a month for two months, and Minner agreed to afford him protection from prosecution for operating a still in Ford county. He operated a still on the Arbaugh farm northeast of Dodge City for two months and paid Minner the agreed amount.

---

Theodore Geselle and certain other named defendants should engage in the business of unlawfully manufacturing, possessing, transporting, and selling intoxicating liquor; that Minner should act as the representative of the several conspirators to offer and give certain money to John B. Madden, assistant prohibition administrator for Kansas, to induce Madden to violate his official duties by permitting the several conspirators to unlawfully manufacture, possess, transport, and sell intoxicating liquor; that four other named defendants, who were deputy sheriffs of Sedgwick county, Kansas, by virtue of their official position should afford protection to the conspirators actually engaged in the manufacture, possession, transportation, and sale of intoxicating liquor; and that two other named defendants should furnish materials and supplies to the conspirators actually engaged in the manufacture, possession, transportaiton, and sale of intoxicating liquor to be used by them in such unlawful enterprise, knowing they were to be so used.

It also charged that, in furtherance of such conspiracy, at Dodge City, Kansas, Minner and Gorges paid Madden $1,000 on February 15, 1930, and $1,000 on April 1, 1930, and Minner, Gorges and Geselle paid Madden $1,000 on May 1, 1930, to induce Madden to violate his official duty and permit Gorges and Geselle to unlawfully manufacture, possess, transport, and sell intoxicating liquor; and that Norton and Nelson on May 1, 1930, paid $250 to Brice F. Armstrong, a federal prohibition investigator, for the purpose of having Armstrong aid and assist Nelson in the unlawful possession, transportation, and sale of intoxicating liquor, and to arrange with Madden to have a case dismissed, which was then pending in the United States court against Nelson for violation of the National Prohibition Act (27 USCA).

Clark Arbaugh testified that in the summer of 1928 he rented a farm northeast of Dodge City to Norton for two months for $50.00

The above testimony was introduced over the objection of counsel for Minner that it was long prior to the conspiracy charged and tended to establish an offense separate and distinct from the offense here charged.

As a part of the cross-examination of Madden, counsel for Minner sought to identify and introduce certain correspondence that passed between Minner and Madden from December 10, 1928, to September 12, 1929, tending to show that Minner was cooperating with the federal officers in the enforcement of the Prohibition Law in Ford county. Counsel also sought to show that Minner furnished an automobile to two agents working under Madden and that it was used by them to investigate certain violations Minner had reported. On objection of the government, this evidence was rejected.

Over objection of counsel for Minner that it was hearsay and not binding on Minner, Gorges was permitted to testify to certain conversations between him and Norton after September 1, 1929, and prior to February 15, 1930, to the effect that Norton had told Gorges that Minner had stated to Norton: "That he thought he could get some Federal help;" "That he thought he could get to Johnnie Madden;" "That he thought he could fix it up;" "That he had told * * * Madden about the deal and that Madden wanted to think it over and would let him know later;" "That he was ready to go;" and "That he was ready to do business."

Brice F. Armstrong, a prohibition agent working under Madden, testified to the following: Norton told Armstrong that Nelson had tuberculosis; that the United States marshal had a warrant for Nelson and was trying to apprehend him; and that he wanted to pay $250 to stop the warrant and to permit Nelson to operate at Dodge City until after harvest and then go to Arizona for his health. Armstrong and Norton went to Dodge City on May 1. On the way Norton pointed out a farm and said that for two months he had operated a still there and had paid Minner for protection. While at Dodge City Norton paid him $250 to obtain a dismissal of the Nelson case.

Minner testified to the following: He was county attorney of Ford county, Kansas, from 1924 to June 19, 1930. During that time he prosecuted approximately 160 liquor cases and obtained 158 convictions. He denied the transaction with Norton in August, 1928. From the spring of 1928 to May, 1930, Madden frequently consulted with him concerning liquor violations. Minner on several occasions furnished Madden with information on which he brought prosecutions and procured convictions. In the fall of 1929 he furnished a car to Madden's agents to be used in Ford and Finney counties. He identified certain correspondence had between him and Madden in November and December, 1929, which indicated that he was cooperating at that time with Madden in the enforcement of the Prohibition Law. He first met Norton in the fall of 1929. After some preliminary conversation, Norton said that he had a friend engaged in the liquor business who was trying to find someone who could deal with Madden. Minner told Norton he did not care to discuss such a matter with him. Norton said, "This man can pay plenty; he can pay enough to scare him; he can pay $2,000 a month." Minner told Norton he was not interested and asked him to leave. Minner reported this conversation to Madden. About December 20, 1929, Madden came to Minner's office and requested him to find out from Norton the name of the man Norton had talked about. Minner ascertained that Norton was in Old Mexico and so reported to Madden. Madden instructed Minner to see Norton when the latter returned and, if necessary, tell him Madden was interested in the proposition. About February 5, 1930, Madden again inquired of Minner if he had seen Norton and then said, "If he does come back and you can get in touch with him, you telephone me at Topeka and I will be out."

He testified in detail to later transactions had between Gorges, Madden, and him, and to the effect that he thereafter acted at the request and under the direction of Madden in an effort in good faith to aid the latter to get a list of Gorges's still locations and evidence of bribery against Gorges. In many particulars he was corroborated by Madden's testimony.

He further testified to the following: On February 14, 1930, Gorges asked Minner what arrangements he had made with Madden for himself. Minner said he had not made any and asked what was customary. Gorges said, "Well, it is customary for the go-between to get 20 per cent." Minner reported such conversation to Madden. The payments made by Gorges were $1,000 and not $1,200, and Minner turned the full

amount thereof over to Madden on each occasion. On May 1, 1930, Minner asked Madden why he had not raided the Gorges stills and Madden said they were waiting to locate the Thomas alcohol stripping plant.

He denied that he told Madden on February 15 that Gorges had paid him $200.

Counsel for Minner contend that the indictment charges a general conspiracy entered into near the city of Wichita between fifty alleged conspirators, in which Minner was to act as the representative of Gorges and the other conspirators to purchase protection from Madden for all of them; that overt acts one and two allege payments' by Minner to Madden to purchase protection for Gorges alone; that overt act three alleges a payment by Minner to Madden to purchase protection for Gorges and Geselle only; that these overt acts were not in the furtherance of the general conspiracy charged in the indictment but of a smaller conspiracy. Gorges was the head of a group engaged in the unlawful manufacture, transportation, and sale of intoxicating liquor. Under these circumstances protection of Gorges would necessarily include those associated with him in such unlawful acts. We are of the opinion that the purchase of protection for Gorges was an act in furtherance of the objects of the general conspiracy charged.

■■ Counsel for Minner assert that overt act four clearly was not in furtherance of the general conspiracy charged, but of a separate and distinct conspiracy. This contention is well taken. The transaction between Norton, Nelson, and Armstrong constituted a separate and distinct conspiracy; it was not shown to be a part of, nor in anywise connected with the general conspiracy charged. Proof should not have been received concerning it, and it should not have been submitted to the jury as one of the overt acts in furtherance of the conspiracy charged. Marcante v. United States (C. C. A. 10) 49 F.(2d) 156; Wyatt v. United States (C. C. A. 3) 23 F.(2d) 791, 792; Terry v. United States (C. C. A. 9) 7 F.(2d) 28, 30; United States v. Wills (C. C. A. 3) 36 F.(2d) 855, 857. But the allegation and proof of one overt act in furtherance of a conspiracy is sufficient and the indictment was not bad because overt act four was insufficient. Jung Quey v. United States (C. C. A. 9) 222 F. 766; Tillinghast v. Richards (D. C. R. I.) 233 F. 710; United States v. Orr (D. C. R. I.) 233 F. 717.

Counsel for Minner maintain that the court erred in admitting the testimony of Norton that he bribed Minner in August, 1928, and the testimony of Nelson and Arbaugh above set out.

■ As a general rule, evidence of another crime is inadmissible, but to this rule there are certain well recognized exceptions. It does not apply where the evidence of the other crime tends to prove the crime charged, and evidence which is relevant upon the question of a defendant's guilt is not rendered inadmissible because it tends to prove him guilty of another and distinct offense. Astwood v. United States (C. C. A. 8) 1 F.(2d) 639, 640; Coulston v. United States (C. C. A. 10) 51 F.(2d) 173.

■ Proof of prior acquaintance and association between the alleged conspirators is competent. It tends to show that their entering into the conspiracy charged was not improbable. United States v. Greene (D. C. Ga.) 146 F. 803, 826; Wallace v. United States (C. C. A. 7) 243 F. 300, 306; Hood v. United States (C. C. A. 8) 23 F.(2d) 472, 475; Means v. United States (C. C. A. 2) 6 F.(2d) 975, 977; Shea v. United States (C. C. A. 6) 236 F. 97.

■ According to the evidence Norton opened the negotiations for the alleged bribes paid in the instant case. Minner's defense was that he acted in good faith and not with criminal intent. Under such circumstances evidence of a similar transaction is admissible for the purpose of showing intent or motive. Williamson v. United States, 207 U. S. 425, 450, 451, 28 S. Ct. 163, 52 L. Ed. 278; Means v. United States, supra; United States v. Rosenstein (C. C. A. 2) 34 F.(2d) 630, 635; Shea v. United States, supra; Jones v. United States (C. C. A. 9) 162 F. 417, 427; Thomas v. United States (C. C. A. 8) 156 F. 897, 911, 17 L. R. A. (N. S.) 720; 16 C. J. p. 595, § 1151.

In Williamson v. United States, supra, the charge was conspiracy to suborn perjury in connection with obtaining public lands of the United States. Evidence of similar offenses committed by the defendants with respect to state lands was held admissible to show intent or motive.

■ We are of the opinion that Arbaugh's testimony was irrelevant and should have been excluded. It corroborated Norton's testimony that he operated a still on the Arbaugh place, but not Norton's testimony that he bribed Minner.

■ We conclude that Nelson's and Norton's testimony was admissible to show the lat-

ter's acquaintance and association with Minner, and on the question of Minner's intent. However since the evidence in the case was long and involved, the court should have carefully directed the jury to consider such testimony for such purposes only, both at the time of its admission and in the general charge.

Counsel for Minner contend that the court erred in permitting Gorges to testify to what Norton had told him Minner had said and done prior to February 15, 1930. The indictment charged a conspiracy to violate the National Prohibition Law. Such offense was to be committed by Gorges and those associated with him in the manufacture, transportation, and sale of intoxicating liquor. According to the government's evidence, Gorges and his associates were not engaged in such unlawful acts on February 15, 1930, and Gorges was unwilling to engage therein without first making a satisfactory arrangement with Madden. While a conspiracy may have been in the contemplation of the parties during the preliminary negotiations which took place between Gorges and Norton, Norton and Minner, and Minner and Madden prior to February 15, 1930, no agreement to violate the National Prohibition Law was entered into between Minner, Norton, and Gorges until the arrangements were consummated with Madden on that date. The conspiracy charged was entered into on such date.

Where two or more persons have conspired to commit an offense against the United States or to defraud it, everything said, done, or written by each of them during the existence of the conspiracy and in the execution or in furtherance of such conspiracy is admissible in evidence against the other. Wiborg v. United States, 163 U. S. 632, 16 S. Ct. 1127, 41 L. Ed. 289; Clune v. United States, 159 U. S. 590, 16 S. Ct. 125, 40 L. Ed. 269; Isenhouer v. United States (C. C. A. 8) 256 F. 842; Van Riper v. United States (C. C. A. 2) 13 F.(2d) 961; Morrow v. United States (C. C. A. 8) 11 F.(2d) 256, 259; Hitchman C. & C. Co. v. Michell, 245 U. S. 229, 249, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; 16 C. J. 644, § 1283.

To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established. Pope v. United States (C. C. A. 3) 289 F. 312, 315; Kelton v. United States

(C. C. A. 3) 294 F. 491, 495; Isenhouer v. United States, supra; United States v. Goldberg, 7 Biss. 175, 25 Fed. Cas. page 1342, No. 15,223; United States v. McKee, 3 Dill. 551, 26 Fed. Cas. page 1107, No. 15,686; United States v. Richards (D. C. Neb.) 149 F. 443; Burns v. United States (C. C. A. 8) 279 F. 982, 986; Dolan v. United States (C. C. A. 9) 123 F. 52; Stager v. United States (C. C. A. 2) 233 F. 510.

Declarations of one conspirator to another are not competent evidence to establish the connection of a third person with the conspiracy. Kuhn v. United States (C. C. A. 9) 26 F.(2d) 463; United States v. McKee, supra.

The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirators done or made in his absence. Hauger v. United States (C. C. A. 4) 173 F. 54, 57; United States v. Richards, supra; United States v. Goldberg, supra; United States v. McKee, supra.

The acts or declarations of a conspirator prior to the formation of the conspiracy or after its termination are not admissible against his co-conspirators. Collenger v. United States (C. C. A. 7) 50 F.(2d) 345, 348; Lane v. United States (C. C. A. 8) 34 F.(2d) 413, 416; Hauger v. United States, supra; Morrow v. United States, supra; Gerson v. United States (C. C. A. 8) 25 F.(2d) 49, 55, 56; Brown v. United States, 150 U. S. 93, 14 S. Ct. 37, 37 L. Ed. 1010.

The acts and declarations of a conspirator to be admissible against his co-conspirators must occur during the existence of the conspiracy and must be in furtherance of its objects. Brown v. United States, supra; Lane v. United States, supra.

The declarations of Norton occurred prior to the formation of the conspiracy charged and were not binding upon nor admissible against Minner.

Counsel for Minner assert that the court erred in permitting Armstrong to testify to what Norton told him about bribing Minner and manufacturing liquor in 1928. This was a declaration of a past event, not in furtherance of the conspiracy charged, purely hearsay, not binding upon Minner, and should have been excluded.

Counsel for Minner urge that the court erred in restricting their cross-exam-

ination of Madden. Madden's testimony tended to establish that Minner acted with criminal intent to bribe Madden. Minner's other official dealings with Madden about the same time had a material bearing upon the construction to be placed on the transactions and conversations which took place between Minner and Madden. A full cross-examination of the witness upon subjects of his examination in chief is the absolute right, not the mere privilege, of the party against whom such witness is called, and denial is prejudicial error. Heard v. United States (C. C. A. 8) 255 F. 829; Alford v. United States, 282 U. S. 687, 691, 692, 51 S. Ct. 218, 75 L. Ed. 624. We conclude that the court erred in so restricting the cross-examination of Madden.

■■■ Counsel for Minner contend that the court erred in overruling their motion for a directed verdict. They argue that if the evidence established a conspiracy, it was one between Gorges, Minner, and Madden for the protection of Gorges alone, and not the general conspiracy charged in the indictment. The evidence discloses that Minner knew that Gorges intended to operate on a large scale and that it would be necessary for him to take other persons into the conspiracy to aid and assist in the manufacture, transportation, and sale of the liquor. It was clearly in the contemplation of the parties that protection was to be afforded not only to Gorges but to those associated with him in such unlawful enterprise. Furthermore the indictment charged a conspiracy to manufacture, possess, transport, and sell intoxicating liquor, not one to bribe Madden. We are of the opinion that the evidence was sufficient to take the case to the jury.

■■■ Counsel for Minner assert that the court erred in admitting the testimony of Armstrong as to the transaction between him and Norton in behalf of Nelson. The evidence shows that this was a separate and distinct conspiracy. It did not show that it was connected with, related to, or in furtherance of the conspiracy charged. It was not admissible in this case for any purpose.

■■■ Counsel for Minner contend that the court erred in refusing to give an instruction requested by them upon the question of Minner's criminal intent, and upon the theory of his defense, and in giving that portion of its general charge relating to Minner's intent.

In its general charge, the court in part said:

"The defendant was the county attorney of Ford County. As such, his duties were fixed by statute and his failure to perform those duties is not a violation of federal statute, and this court would have no jurisdiction to prosecute him for a failure to perform his statutory duties. If, however, the defendant Everett C. Minner, the county attorney, had knowledge that certain of the defendants had entered into an unlawful agreement and conspiracy to manufacture, transport, sell and possess intoxicating liquors in Sedgwick County, or within this district, and with the knowledge of the existence of said unlawful agreement, he acquiesced in said agreement and either by advice to a codefendant or by some act, intentionally contributed to the accomplishment of the purposes of the conspiracy, then he would become a part of the conspiracy to the same extent as though he had originally participated in its formation. If however, you find from all the evidence in the case that the defendant Minner in good faith entered into an arrangement with John B. Madden, assistant federal administrator to assist the said John B. Madden in the performance of his duties and in the enforcement of the national prohibition act, and in good faith assisted the said Madden and the federal government in detecting and uncovering the alleged conspiracy, and with the intent in good faith to uphold and enforce the law, then and in that event you should find him not guilty."

The requested instruction accurately stated the theory of Minner's defense and placed on the government the burden of proving beyond a reasonable doubt that he acted with criminal intent. The burden was on the government to establish every essential element of the offense, including criminal intent. No burden rested on Minner to establish that he acted innocently and without criminal intent. If, after considering all the evidence, the jury entertained a reasonable doubt as to his intent, he was entitled to an acquittal. To justify an acquittal under the court's instruction, it was necessary for the jury to find affirmatively that Minner acted innocently and in good faith. The instruction was bad because it shifted the burden of proof to Minner and required an affirmative finding of his innocence. Drossos v. United States (C. C. A. 8) 2 F.(2d) 538; State v. Laris (Utah) 2 P.(2d) 243; Findley v. State, 13 Okl. Cr. 128, 162 P. 680; Davis v. State, 17 Okl. Cr. 604, 191 P. 1044; Stephenson v. State, 30 Okl. Cr. 286, 235 P. 1114; State v. Trudell, 49 S. D. 532, 207

N. W. 465; Lindley v. State, 201 Ind. 165, 166 N. E. 661; Claunch v. State, 82 Tex. Cr. R. 114, 198 S. W. 307; State v. Kirkland, 178 N. C. 810, 101 S. E. 560.

Counsel for Minner also assert that that portion of such instruction which dealt with the entry of Minner into the conspiracy already formed was erroneous for the reason that it was not justified by the evidence. The evidence tended to establish a conspiracy entered into by Norton, Gorges, and Minner. It did not tend to show that Minner entered an existing conspiracy after its formation.

For the reasons stated we conclude the instruction was erroneous.

Counsel for Minner also contend that the court erred in the following portion of its general charge:

"I also instruct you that the character or reputation of an officer of the government or of this court is not to be impugned because he does his duty. He is presumed to be an honest and conscientious officer, unless there is evidence offered to the contrary, and there was no evidence offered in this case to impeach the character or the reputation of Mr. Madden, or any of the other government officers."

With reference to the performance of official duty, the presumption applied equally to Minner. The character or reputation of Madden had not been attacked. To thus single out and bolster up the testimony of Madden, upon which the government's case principally depended, was improper and erroneous. People v. O'Brien, 135 App. Div. 85, 119 N. Y. S. 788; Bronstein v. United States (C. C. A. 8) 17 F.(2d) 12; 16 C. J. § 2438.

Counsel for Minner contend that the court erred in giving the following portion of its instructions:

"Did the defendants William Norton and Goldie Nelson, in furtherance of a conspiracy, give Brice F. Armstrong, a government witness here, the sum of $250 in order that Armstrong as an officer of the United States, would aid and assist Nelson and Norton in violating the National Prohibition Act as set out in overt act 4 of the indictment?"

This, as we have already indicated, was clearly erroneous. This transaction was not connected with or in furtherance of the conspiracy charged. The charge of the court did not so limit it. It says, "In furtherance of *a* conspiracy" not in furtherance of *the* conspiracy charged.

Finally, counsel for Minner maintain that the court erred in that portion of its general charge wherein he commented on the facts. The trial judge undertook to sum up and comment on the evidence. He narrated the important facts testified to by witnesses for the government but he wholly failed to sum up the evidence in behalf of Minner. His comments were in the nature of an argument to the jury rather than a fair and dispassionate statement of what the evidence showed and a tempered expression of his opinion as to the facts. In doing so, he assumed the role of an advocate rather than an impartial judge. That this was error is established by repeated decisions. O'Shaughnessy v. United States (C. C. A. 5) 17 F.(2d) 225; Sunderland v. United States (C. C. A. 8) 19 F.(2d) 202; Cook v. United States (C. C. A. 8) 18 F.(2d) 50; Cline v. United States (C. C. A. 8) 20 F.(2d) 494; Weare v. United States (C. C. A. 8) 1 F.(2d) 617; Rudd v. United States (C. C. A. 8) 173 F. 912; Wallace v. United States (C. C. A. 6) 291 F. 972; Hickory v. United States, 160 U. S. 408, 16 S. Ct. 327, 40 L. Ed. 474.

In so holding we do not intend to limit the right of a trial judge to properly sum up the facts and express his opinion thereon. To do so is not only his right but, in many cases, his duty. As said by the court in Rudd v. United States (C. C. A. 8) 173 F. 912, 914:

"A judge should not be a mere automatic oracle of the law, but a living participant in the trial, and so far as the limitations of his position permit should see that justice is done."

But in summing up and commenting on the evidence, the trial judge should be governed by certain well recognized limitations inherent in the very nature of the judicial office. He should state the evidence fairly and accurately, both that which is favorable and that which is unfavorable to the accused. His statements should not be argumentative, but impartial, dispassionate, and judicial; and they should be so carefully guarded that the jurors are left free to exercise their independent judgment upon the facts.

Reversed and remanded with instructions to grant Minner a new trial.