Samuel Elvin TRIPP, Appellant,

v.

UNITED STATES of America, Appellee.

Charles Clarence TRIPP, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 6697, 6698.

United States Court of Appeals Tenth Circuit.

Sept. 18, 1961.

Carloss Wadlington, Ada, Okl., for appellants.

Harry G. Fender, Asst. U. S. Atty., Muskogee, Okl. (Edwin Langley, U. S. Atty., Muskogee, Okl., was with him on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

A nine-count indictment was returned in the United States District Court for the Eastern District of Oklahoma. The first count charged Samuel Elvin Tripp, Charles Clarence Tripp, Jr., Goforth, Frank Looney Lauderdale, Rose Bell Lauderdale, Archer and Clopton with conspiracy to possess, utter and sell counterfeit obligations of the United States. It alleged that the conspiracy began on July 15, 1960, and continued to July 21, 1960. The second count charged the Tripps with possession of 27 counterfeit $100 Federal Reserve Notes. The third count charged that the Tripps sold 27 counterfeit $100 Federal Reserve Notes to Lauderdale and Archer. Each of the fourth, fifth and sixth counts charged the Tripps, Goforth, the Lauderdales and Archer with passing a counterfeit $100 Federal Reserve Note. Each of the seventh and eighth counts charged the defendants named in the fourth, fifth and sixth counts and Clopton with passing a counterfeit $100 Federal Reserve Note; and the ninth count charged them with possessing 14 counterfeit $100 Federal Reserve Notes. Archer entered a plea of guilty. The remaining defendants entered pleas of not guilty and each of them was convicted on every count on which he or she was charged. The Tripps were sentenced to imprisonment for a period of five years on each of the nine counts on which they were convicted. The sentences were to run concurrently. They have appealed.

The Tripps assigned several grounds for reversal, but we find it necessary to consider only their contention that the court erred in not sustaining a motion for directed verdicts of not guilty as to them, for the reason that the evidence against them was insufficient to warrant verdicts of guilty.

In order to place the case in proper posture to consider the sufficiency of the evidence against the Tripps, we shall set forth certain of the evidence introduced by the Government, which directly relates to other defendants than the Tripps.

Archer, called as a witness by the Government, testified that in June, 1960, Goforth stated to him and Frank Lauderdale that he knew where he could probably get some counterfeit money; that he had a conversation on July 16, 1960, with Frank Lauderdale and Goforth concerning counterfeit money and that Goforth at that time showed them a counterfeit $100 bill and asked Lauderdale if he could get rid of it; that he, Goforth and Lauderdale went to a tavern, where they left Rose Lauderdale, and proceeded to the Penney Store in Dallas, where he attempted to pass the bill, but was unsuccessful; that the following day he and the Lauderdales drove to Muskogee, Oklahoma, in Lauderdale's automobile; that on the way he attempted to pass a counterfeit bill at a Safeway Store in McAlester, but was unsuccessful; that they stayed overnight at the Cherokee Motel in Muskogee and that he paid the bill with a counterfeit $100 bill and gave the change which he received to Lauderdale; that on the morning of July 18, he and Lauderdale went to Goforth's home in Muskogee in Lauderdale's automobile; that he went into the Goforth house to visit with Mrs. Goforth; that Lauderdale remained in the automobile in the yard; that after he had been in the house some time Lauderdale blew the horn of the automobile; that he left the house; that Lauderdale was seated in the automobile; that he entered the automobile and that they left the Goforth premises; that as they were leaving Lauderdale told him he had purchased some counterfeit money; that he had paid therefor $200 and was supposed to pay $300 more; and that he was supposed to get some more counterfeit money; that they met Clopton at

Fort Gibson and drove south toward Dallas, Texas; that they stopped at a watermelon stand at Atoka, Oklahoma; that Lauderdale and Clopton went to the stand; that he, the Lauderdales and Clopton were arrested about one-half mile from the watermelon stand.

The clerk at the Penney Store in Dallas testified that on July 16, 1960, Archer attempted to pass to him a $100 bill; that he became suspicious and that while he was attempting to call the "Secret Service" Archer left. A clerk for the Name Brand Shoe Store in Dallas, Texas, testified that on July 16, 1960, she received a $100 bill from Goforth in payment for shoes. She later learned that the bill was counterfeit and identified it at the trial. A clerk for the Safeway Store in McAlester, Oklahoma, testified that on July 16, 1960, Archer offered her a $100 bill for groceries, but when she was unable to give him change for the bill, he left without the groceries. The owner of the Cherokee Motel at Muskogee testified that on July 17, 1960, Archer rented a room and paid the rental with a $100 bill. He identified the bill at the trial. The operator of a billiard parlor in Muskogee testified that on July 19, 1960, Goforth passed to him a $100 bill, which he later learned was counterfeit. He identified the bill at the trial. The operator of the Bell Tavern in Muskogee testified that on July 19, 1960, he changed a $100 bill for Lauderdale. He identified the bill at the trial. A plumber testified that on July 19, 1960, Goforth paid him for some plumbing work with a $100 bill. He identified the bill at the trial. An attendant for a gas station at Savanna, Oklahoma, testified that on July 21, 1960, Clopton gave him a $100 bill in payment for gas. He identified the Lauderdales as persons who were present with Clopton at the time the bill was passed. The attendant identified the bill at the trial. The operator of the watermelon stand near Atoka, Oklahoma, testified that on July 21, 1960, Clopton gave him a $100 bill in payment for some melons. He identified the Lauderdales as persons who were present with Clopton at the time the bill was passed. He identified the bill at the trial.

All the bills which the testimony had proved were passed by one or more of the defendants were received in evidence and the evidence established that each of them was counterfeit.

At the trial, Charles Tripp testified that he resided in St. Louis, Missouri, and worked for a service station; that Goforth was his uncle; that on July 15, 1960, he made a trip with his brother, Samuel, from Missouri to Muskogee, Oklahoma, to visit Goforth; that Goforth, his brother, Samuel, and he went downtown to have a drink; that they then went to Dallas, where Goforth wanted to see Archer about a job; that Archer lived at Lauderdale's home; that they left Muskogee about 4:00 p. m. and arrived in Dallas about midnight; that they stayed at the Travis Hotel in Dallas; that about 9:00 the next morning they went to Lauderdale's home; that he, Archer, the Lauderdales, Goforth, and his brother, Samuel, visited three or four taverns. He stated that on the trips to Muskogee and Texas he did not see any counterfeit money, nor any of the bills that had been introduced in evidence; that he did not have possession of any of the bills; that he was not present when any of them were passed or cashed, and that he never saw his brother, Samuel, in possession of such bills. He denied any knowledge with respect to the counterfeit bills. He stated that they remained in Dallas until Sunday morning; that they went back to Muskogee and stayed all night at Goforth's home; that they left the next morning and returned to Missouri; that the travel from St. Louis to Muskogee and to Dallas and the return to Muskogee and to St. Louis was in his automobile.

Samuel Tripp testified in his own behalf. He stated that he resided at Ellington, Missouri, and that he was a dealer in livestock. His testimony in other respects was substantially the same as Charles Tripp's and he denied any knowledge or connection with the counterfeit money.

In addition to the facts admitted by the Tripps in their testimony, the only facts established by the evidence, other than the evidence of the statements and confessions made by their codefendants hereinafter referred to, which tend to prove the guilt of the Tripps of the offenses charged against them were these:

On the night of July 15, 1960, Samuel Tripp registered at the Travis Hotel in Dallas. He was accompanied by another man. He signed the register as "Jim Shey and party." On July 16, 1960, Archer saw the Tripps with Goforth in a car at the Lauderdale home, but heard no conversation at that time with the Tripps, or in their presence, regarding counterfeit money. The Tripps accompanied Archer, Goforth and the Lauderdales to a tavern in Dallas. Archer, Goforth and Lauderdale left the tavern. They later returned to the tavern and found the Tripps still there. On July 17, 1960, the Tripps and Goforth returned in Charles Tripp's automobile to Goforth's home in Muskogee.

On July 18, 1960, Archer and Lauderdale went to Goforth's home in Muskogee in Lauderdale's automobile. When they arrived in the Goforth's yard, the Tripps were standing in the yard. Archer went into the Goforth house and Lauderdale remained in the automobile. Thereafter, Lauderdale blew the automobile horn. Archer came out of the house and he and Lauderdale left the Goforth premises in Lauderdale's automobile. As they were leaving the premises, Lauderdale made the statements with respect to the purchase of the counterfeit money hereinbefore set out in the narration of Archer's testimony, but the evidence wholly failed to show that such statement was made in the presence and hearing of the Tripps. On the contrary, there is a fair inference from the evidence that the statements by Lauderdale were made after they had driven away from the Goforth premises.

Thus, it will be seen that the Tripps associated with Goforth, Archer and the Lauderdales from time to time in Dallas, Texas, and Muskogee, Oklahoma, during the period when certain of the counterfeit bills were passed, or attempted to be passed, by certain of their codefendants. The Tripps, testifying in their own behalf, admitted that they so associated with Goforth, Archer and the Lauderdales, but denied that they were present when their codefendants passed or attempted to pass any of the counterfeit bills and denied that they had any knowledge with respect to such counterfeit bills; and apart from the extrajudicial statements and admissions of their codefendants, there was no evidence that the Tripps were present when the substantive offenses charged were committed by their codefendants, or that they had any knowledge of the counterfeit bills, or the possession or passing thereof by their codefendants.

Cantrell, a Special Agent for the United States Secret Service, testified that he and Special Agent Osborne interviewed Goforth on July 20, 1960; that Goforth was advised of his right to an attorney and that he did not need to make a statement if he did not care so to do and if he made a statement it might be used against him; that a written statement was prepared which set forth what Goforth had stated orally to the Agents; that it was read to Goforth; that Goforth stated orally that the statement was true; and that Goforth did not sign the statement for the reason stated by him that it would be the same as testifying against his relatives. The Assistant United States Attorney stated that the oral admissions made by Goforth would be offered as evidence only against him. Thereupon, the court instructed the jury that it should consider the statements made by Goforth only as against him, and should not consider them as evidence against any other defendant in the case. Thereupon, Cantrell was permitted to testify to the oral statements made by Goforth to him and Osborne, after refreshing his memory from the written statement. In the course of the testimony, Cantrell testified to certain statements made by Goforth which referred to the Tripps, as follows: Goforth

is the uncle of the Tripps. Goforth and the Tripps made a trip from Muskogee to Dallas. They arrived in Dallas about midnight, July 15. They stayed at the Travis Hotel in Dallas. In the forenoon of July 16, Goforth and the Tripps drove to the Lauderdale home in Dallas. They there met the Lauderdales and Archer. On the morning of July 16, Goforth saw Samuel Tripp give a $100 bill to Lauderdale. On the evening of July 16, the Tripps, John Archer, the Lauderdales and Goforth went to a place called Patty's Club in Dallas. Goforth saw Samuel Tripp changing some money from his pocket to the automobile in which they were traveling and Samuel Tripp showed him a $100 bill. Goforth was apprised of the fact that the $100 bills were counterfeit.

On July 18, 1960, at the time Lauderdale made the statements to Archer with respect to the purchase of counterfeit money and the future acquisition of counterfeit money, and on July 20, 1960, when Goforth made the oral statements to Cantrell, set forth above in Cantrell's testimony, there was proof of the existence of a conspiracy among the defendants, other than the Tripps, but no proof had been adduced connecting the Tripps with such conspiracy. The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged coconspirators done or made in his absence. Such declarations are admissible against him only where there is proof aliunde of his connection with the conspiracy.[1] Therefore, such statements of Lauderdale and Goforth were inadmissible against the Tripps.

Osborne testified that he interviewed Lauderdale on July 22, 1960, after his arrest, in the County Jail in Ada, Oklahoma; that he advised Lauderdale he was entitled to have an attorney and that he did not have to make a statement; that

Lauderdale made a statement to him which was reduced to writing; that Lauderdale was given a copy of the statement; that it was read to him; and that he signed it. The statement was then produced, identified and offered in evidence. Counsel for the Tripps requested the court to instruct the jury to disregard everything in the statement that reflected on either of the Tripps, for the reason that the conspiracy had terminated on July 21 and the statement was made on July 22 and therefore the portion of the statement which referred to the Tripps was hearsay. The court stated that he would not so instruct the jury at that time, but that he might do so later. The court instructed the jury in his general charge in part as follows:

"* * * a confession or admission or other incriminatory statement made outside of court by one defendant may not be considered as evidence against another not a party thereto, and the confession at most can only be considered against the one making it and is in no way evidence against others even though they may be named in such confession."

The signed confession made by Lauderdale contained the following statements which referred to the Tripps: On Saturday, July 16, 1960, Goforth and the Tripps came to the Lauderdale home. The Tripps told Lauderdale they had some counterfeit notes and asked Lauderdale if he could cash some of them. Lauderdale replied that he thought he could. The Tripps then showed Lauderdale some counterfeit $100 bills and said they were "real good counterfeits." About noon on July 16, 1960, Goforth and Lauderdale went downtown in Dallas in Lauderdale's automobile to pass some of the counterfeit $100 bills. Each of them had one of the $100 bills. The Tripps, Lauderdale's wife, and Archer went in the Tripp automobile to a tavern, where they were to

---

1. Minner v. United States, 10 Cir., 57 F. 2d 506, 511; Continental Baking Co. v. United States, 6 Cir., 281 F.2d 137, 152, 153; Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; Bartlett v. United States, 10 Cir., 166 F.2d 920, 924, 925.

meet later. Lauderdale passed one of the $100 bills and he thought Goforth passed another bill. Lauderdale and Goforth then returned to the tavern, where they joined the Tripps, Mrs. Lauderdale, and Archer. Lauderdale told them he passed the counterfeit bill and he divided the change he had received between Samuel Tripp and himself. Samuel Tripp then gave one $100 bill to Lauderdale, one to Goforth and one to Archer. After Lauderdale, Goforth and Archer had passed certain of the bills, they rejoined Mrs. Lauderdale and the Tripps at a tavern. They then separated and Goforth and the Tripps left in an automobile of one of the Tripps and Archer, Lauderdale and Mrs. Lauderdale left in Lauderdale's Buick. They agreed to meet in Muskogee later. On Monday, July 18, 1960, Lauderdale and Archer went to Goforth's home in Muskogee. The Tripps sold Lauderdale 27 $100 bills, for which Lauderdale paid $200 in cash and agreed to pay the balance of $300 later. Samuel Tripp told Lauderdale they would be back in Muskogee in two or three weeks and would have a large number of counterfeit $20 bills.

■ Lauderdale's written statement, given to the Special Agent after his arrest and introduced in the Government's case in chief, was made after the conspiracy had terminated and was not made in furtherance of the conspiracy. It was admissible only against Lauderdale and not against the other defendants on trial.[2] The court should have so instructed the jury, as requested by counsel for the Tripps, when the statement was admitted.[3]

Because counsel for the Government contend that the statements of Lauderdale and Goforth were rendered admissible as substantive evidence against their codefendants by reason of what transpired during the direct and cross-examination of Lauderdale and Goforth, testifying as witnesses for the defendants, it becomes necessary to narrate the pertinent parts of their testimony.

Goforth testified as a witness in his own behalf and in behalf of the other defendants on trial. On his direct examination he testified that the Tripps came to his home in Muskogee on July 15; that the Tripps were his nephews; that they traveled to Dallas in an automobile belonging to one of the Tripps; that he went to Dallas to see about a job with a plumber that Archer had told him about; that they arrived in Dallas about midnight and stayed at the Travis Hotel; that they went to Lauderdale's home the next morning for the purpose of seeing Archer about the job with the plumber; that during the time he was at the Lauderdale's home there was no conversation with respect to any counterfeit bills and that while he was in Dallas he heard nothing with respect to counterfeit bills; that on Sunday morning, July 17, 1960, they started back to Muskogee; that the automobile broke down and they did not arrive at Muskogee until 3:00 p. m.; that he had no conversation with the Tripps about any counterfeit money; that he never heard counterfeit money mentioned in any way at all.

On cross-examination Goforth testified that during the time he was interviewed by the Special Agents, Agent Osborne made notes on a scratch pad and then prepared a typewritten statement; that he glanced at it, but did not read the statement, and that no one read it to him; that he told Osborne that he would not sign the statement and there was no reason why he should read it.

Goforth was then asked if he did not state to the Special Agents that on July 15, 1960, while he and the Tripps were in a tavern in Muskogee, the Tripps asked him if he knew where they could get rid of some bills, some big bills that were "phony" or "hot" bills, and that the

2. Bartlett v. United States, 10 Cir., 166 F.2d 920, 924; Minner v. United States, 10 Cir., 57 F.2d 506, 511; Rimmer v. United States, 5 Cir., 172 F.2d 954, 959;

Krulewitch v. United States, 336 U.S. 440, 442–444, 69 S.Ct. 716, 93 L.Ed. 790.

3. Delli Paoli v. United States, 352 U.S. 232, 238, 77 S.Ct. 294, 1 L.Ed.2d 278.

Tripps stated they were $100 bills. Goforth denied that he made any such statement to the Agents. He was then asked if he denied that on July 20, 1960, he told Osborne that one of the Tripp brothers asked him if he knew where they could get rid of some bills. Goforth answered, "I deny it." He was then asked if he did not tell Mr. Osborne that when they arrived at Patty's Club, Samuel Tripp was changing his money around; taking $100 bills out of his pocket and putting them in the trunk of the Chevrolet automobile in which they were traveling. Goforth denied that he made that statement. He said that what he told the Agents was that Sam Tripp took some money out of the pocket of his sport coat and put the sport coat in the trunk of the automobile. He was then asked if he did not tell the Special Agents that he heard Lauderdale say he was going to borrow $500 in Muskogee in order to raise more money to buy counterfeit notes from the Tripps. Goforth denied making any such statement. Goforth was then asked if he did not state to the Agents that Lauderdale gave him two $100 bills and he thought it was in payment for his having put Lauderdale in touch with the Tripps. Goforth denied making any such statement. On redirect examination he testified that he never saw either of the Tripps with any of the $100 bills introduced in evidence and that he never had any conversation with them about counterfeit money.

Thus, it will be seen that Goforth denied making any statements to the Special Agents which in anywise tended to incriminate the Tripps, other than the association of the Tripps, with Goforth, the Lauderdales, and Archer, during a portion of the period when such other defendants possessed or passed counterfeit bills.

Lauderdale testified as a witness in behalf of the defendants. In his direct examination he testified that at the time he made the written statement introduced in evidence, he was suffering from the excessive use of intoxicating liquor during the previous six days; that Osborne told him they had a strong case against him and he was going to the penitentiary; that he could be given 15 years on each counterfeit note; and that he was induced to make the statement by Osborne's promise to have Mrs. Lauderdale's bail reduced and his automobile, which had been seized by the Government, released. He further testified that he never had any discussion with the Tripps about counterfeit money.

He further testified, in explanation of the counterfeit bills that were found in his possession and which he had passed, that they were a part of bills that Archer had given him in part payment of a debt and bills that Archer had given him for safekeeping at a time when Archer was drinking heavily and fearful that he might be robbed.

On cross-examination, he again testified that he never talked to the Tripps with respect to counterfeit money and denied that he purchased 27 counterfeit $100 bills from the Tripps. That portion of his statement relative to such purchase was read to him and he denied that he made that statement to Mr. Osborne.

■ We come now to the contention that what transpired on the examination and cross-examination of Goforth and Lauderdale rendered their statements admissible as substantive evidence. Of course, the statement of Lauderdale was admissible for the purpose of impeaching him and the statements of Goforth were admissible for the purpose of impeaching him, but it is well settled that contradictory statements introduced for the purpose of impeachment are not admissible as substantive evidence.[4] Counsel for the Government undertake to justify the admission of the statements of Lauderdale and Goforth as substantive

4. Bridges v. Wixon, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103; Hickory v. United States, 151 U.S. 303, 309, 14 S. Ct. 334, 38 L.Ed. 170; National Labor Relations Board v. Quest-Shon Mark Brassiere, 2 Cir., 185 F.2d 285, 289 (contradictory statements of a recalcitrant witness), certiorari denied 342 U.S. 812, 72

evidence by the application, through analogy, of the rule that when a witness called by a party becomes recalcitrant, the party may, with the consent of the trial judge, granted in the exercise of his discretion, be permitted to cross-examine the witness and inquire whether he had not at other times made statements contradictory of the evidence he had given at the trial. That rule is well established.[5] But such contradictory statements do not become substantive evidence unless the witness recants his earlier testimony and admits or states that such statements correctly reflect the true facts.[6] The effect of so doing is to make the statements a part of the witness's present testimony.

The rule has been extended in the Second Circuit, where it has been held that the recalcitrant witness may affirm the truth of his prior contradictory statements impliedly by conduct,[7] but we are not here called upon to determine whether the rule should be extended to the degree indicated by the decisions of the Second Circuit. Here, Goforth not only denied that he made the contradictory statement relating to the Tripps, testified to by the Special Agent, but also in substance denied that such statements, insofar as they related to the Tripps, reflected the truth.

Likewise, Lauderdale, while he admitted signing the confession, denied that he made the statements set forth in the confession relating to the transactions with respect to the counterfeit bills, insofar as they related to the Tripps, and also denied that such statements reflected the truth.

Furthermore, there is an important difference in the situation where a party is permitted to cross-examine his own recalcitrant witness and to bring out contradictory statements theretofore made by such witness and the introduction of contradictory statements, after a proper foundation has been laid, to impeach an adverse witness. In the former situation, the adverse party has the opportunity to examine the recalcitrant witness. In the latter situation, he may not cross-examine his own witness.

We conclude, therefore, that the asserted contradictory statements with respect to which inquiry was made of the witnesses Goforth and Lauderdale, respectively, were not admissible as substantive evidence and could not be properly considered as such by the jury.

■ It follows that the only substantive evidence against the Tripps was the fact that they were traveling or associated with other defendants at times during the period when such other defendants were engaged in the commission of the offenses charged against them in the indictment. We are of the opinion that such substantive evidence, which we think amounted to nothing more than an attempt to establish guilt by association, was not sufficient to war-

S.Ct. 25, 96 L.Ed. 614; McCracken v. Richmond, F. & P. R. Co., 4 Cir., 240 F.2d 484, 487 (contradictory statements of a recalcitrant witness) ; Eisenberg v. United States, 5 Cir., 273 F.2d 127, 130 (contradictory statements of a recalcitrant witness); Holland v. Cooper, 5 Cir., 192 F.2d 214, 216; Headen v. Pope & Talbot, Inc., 3 Cir., 252 F.2d 739, 744.

5. See, St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936; Curtis v. United States, 10 Cir., 67 F.2d 943, 946; DiCarlo v. United States, 2 Cir., 6 F.2d 364, 365, certiorari denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168.

6. Harman v. United States, 4 Cir., 199 F.2d 34, 36; Zimberg v. United States,

1 Cir., 142 F.2d 132, 136, 137, certiorari denied 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573; Stewart v. Baltimore & O. R. Co., 2 Cir., 137 F.2d 527, 529; Stevens v. United States, 9 Cir., 256 F.2d 619, 623; Perry v. F. Byrd, Inc., 280 Mich. 580, 274 N.W. 335, 336; 98 C.J.S. Witnesses § 628, p. 646.

7. DiCarlo v. United States, 2 Cir., 6 F.2d 364, 368, certiorari denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168; United States v. Block, 2 Cir., 88 F.2d 618, 620, certiorari denied 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347; See also, United States v. Allied Stevedoring Corp., 2 Cir., 241 F.2d 925, 932, certiorari denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143.

rant the jury in finding that the Tripps were guilty beyond a reasonable doubt of the offenses charged in the indictment and that the trial court should have sustained the motion of the Tripps for a directed verdict of not guilty.

Reversed and remanded, with instructions to dismiss the indictment as to the Tripps.