**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Leonard WORTMAN and Gregory Moore, Defendants-Appellants.**

**Nos. 13941, 13942.**

United States Court of Appeals Seventh Circuit.

Jan. 14, 1964.

Murry L. Randall, Morris A. Shenker, Norman S. London, St. Louis, Mo., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Norman Sepenuk, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Carl W. Feickert, U. S. Atty., East St. Louis, Ill., Meyer Rothwacks, Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., Richard B. Buhrman, Atty., Internal Revenue Service, Washington, D. C., for appellee.

Before DUFFY, CASTLE and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Defendants Frank Leonard Wortman and Gregory Moore separately appeal from judgments entered July 17, 1962, following a jury verdict finding them guilty of conspiracy. The indictment, returned January 11, 1960, originally

contained nine counts, all of which were disposed of prior to trial except 1, 2, 3 and 4. Counts 1, 2 and 3 charged Frank Leonard Wortman (afterwards referred to as defendant Wortman to distinguish him from his brother, Edward Wortman) with attempted evasion of his personal income tax for the years 1953, 1954 and 1955. Count 4 charged that defendant Wortman, Elmer Sylvester Dowling, Edward Wortman, Gregory Moore, Sam Magin and George Frank conspired in the manner and for the purposes and objectives subsequently shown. Because of a physical condition, Frank was not tried. The jury was unable to agree as to Edward Wortman on the conspiracy count and as to defendant Wortman on the substantive counts (1, 2 and 3). Defendant Wortman, Moore and Dowling were convicted on the conspiracy count. Magin was acquitted. Dowling died subsequent to the trial.

After a trial which lasted more than six weeks, the case was submitted to the jury on the afternoon of Thursday, February 22, 1962. The jury deliberated the remainder of that day, all of Friday, Saturday and Sunday (9 a. m. to 9 p. m. each day), and returned the verdict above noted at about 4 p. m. on Monday, February 26.

Defendants argue that numerous prejudicial errors were committed which require a reversal of the judgments. Leaving for further consideration, if necessary, many of the issues thus advanced, we shall first consider the contention that a large amount of immaterial, incompetent and prejudicial evidence was admitted over defendants' objections and that the proof of a conspiracy, if any, was not that charged.

We think in the beginning, for reasons which we hope will subsequently become apparent, that the material averments of the conspiracy should be set forth. It alleges in customary language that defendants Wortman and Moore, together with the other persons heretofore named, from July 1, 1944, and continuously thereafter to and including the date of the filing of the indictment (January 11, 1960), conspired and agreed together:

"a. Wilfully to defraud the United States of America of income taxes due and owing for the calendar years 1944 to date from defendant Frank Leonard Wortman.

"b. Wilfully to defraud the United States of and concerning the exercise of its governmental function and right of ascertaining, computing, levying, assessing, and collecting income taxes due and owing to the United States of America for the calendar years 1944 to date by defendant Frank Leonard Wortman.

"c. To commit certain offenses against the United States, to-wit:

"(1) The crime of wilfully attempting to evade and defeat a large part of the income taxes to be due and owing to the United States of America by the defendant Frank Leonard Wortman, for the calendar years 1944 to date in violation of Section 145(b) of the Internal Revenue Code of 1939 (26 U.S.C. § 145(b)) and Section 7201 of the Internal Revenue Code of 1954 (26 U.S.C. § 7201).

(2) The crime of knowingly and wilfully falsifying, concealing and covering up by trick, scheme and device, material facts in matters within the jurisdiction of an agency of the United States, viz., the Internal Revenue Service of the United States Treasury Department, during the period from 1944 to date, in violation of Section 1001 of the Criminal Code (18 U.S.C. § 1001).

"2. It was a part of said conspiracy that the defendant would conceal and continue to conceal the nature and extent of the proprietary and financial interest of the said Frank Leonard Wortman in various partnerships, associations and corporations, and the sources, nature and

amounts of his income for the calendar years 1944 to date.

"a. It was further a part of said conspiracy that the defendants would cause false and misleading entries to be made in the books and records of (1) the partnership known as Gregory Moore et al., (2) a partnership known as Plaza Amusement Company, and (3) a proprietorship known as Paddock Liquor Company, all for the purpose of concealing the financial interests therein of Frank Leonard Wortman.

"b. It was further a part of said conspiracy that the defendants would organize and operate gambling casinos in the form of partnerships, and that in the operation of said gambling casinos the defendants would fail to keep proper books and records concerning their operations, would fail to file certain partnership returns of income required by law, would file inadequate and incomplete partnership returns of income, would cause false and fraudulent books and records to be kept in connection with the casino operations, and would cause to be prepared certain false and fraudulent partnership returns of income, all for the purpose of concealing the true income of said casinos and of the said Frank Leonard Wortman.

"c. It was further a part of said conspiracy that the defendants would cause property and interests in business ventures to be concealed in the names of persons other than Frank Leonard Wortman, for the purpose of concealing the interests of Frank Leonard Wortman therein.

"d. It was further a part of said conspiracy that the defendants would cause false and misleading entries to be made in the books and records of Jack Langer's Mounds Club, Inc. and Plaza Amusement Company, Inc., for the purpose of concealing the true ownership of said companies and the capital investment therein by said Frank Leonard Wortman.

"3. It was further a part of said conspiracy that the defendants would cause to be prepared and filed false and fraudulent individual income tax returns of Frank Leonard Wortman."

Then follows the enumeration of twenty-five overt acts (five of which were eliminated at the trial) alleged to have been performed in furtherance and in execution of the conspiracy.

It is significant to note from the allegations of the indictment that the alleged conspiracy was pursued by all the named defendants for a period of almost sixteen years for the benefit of and as an aid to defendant Wortman in his income tax matters in one way or another. None of the other alleged conspirators (including Moore) were to have received any benefit from or been aided by their sixteen years of concerted action.

The Government's proof in the main relates to five different business enterprises operated over a period of sixteen years: the Hyde Park Club, the National Amusement Company, the Plaza Amusement Company, the Paddock Restaurant and the Premier Club (also referred to as the Peerless Club and the Paramount Club). The testimony concerning the first three named businesses was admitted solely with reference to the conspiracy charge. That concerning the other businesses was admitted primarily on the substantive charges against defendant Wortman upon which the jury failed to agree. It appears, however, that the Government also relies upon this testimony in support of its theory of a continuing conspiracy.

## THE HYDE PARK CLUB.

This Club, organized February 5, 1943 as a partnership, was engaged in the operation of a gambling casino. The partnership consisted of seventeen partners, all named and their respective interests set forth. Moore, with a 7½% interest, was named as a partner. Defendant Wortman was not named. This partnership after some four years of operation terminated its business.

In 1950, Wm. C. Long, a Revenue agent and the first Government witness, commenced an examination of Moore's income tax return for 1947, during the course of which he wrote Moore, "It is noted that you only reported one half of your distributive share of net income from the partnership, 'per a partnership agreement.' Please furnish this office with a copy of such agreement for inspection purposes so that it can be established if a partnership existed as concerns your distributive share of income * * *." Moore responded, "I am enclosing the only copy of this agreement that has been duly signed and witnessed * * *." The agreement (hereinafter called the Moore-Wortman agreement), purportedly signed by Moore and defendant Wortman, bore the names of Moore's wife and his attorney, John W. Joynt, as witnesses, and recited:

"Frank Wortman, aforesaid, is to place in the custody of Gregory E. Moore, aforesaid, $5,000.00 in cash to be used if and as needed in the furtherance of the business of the Hyde Park Club and is to receive in return from said Gregory E. Moore one half of all monies received by Gregory E. Moore as profits from the Hyde Park Club.

"The name of Frank Wortman shall not appear on the partnership of the Hyde Park Club for obvious reasons. But the interests of both Wortman and Moore will be carried in the name of Gregory E. Moore in the Hyde Park Club partnership as reported to the United States Government, Bureau of Internal Revenue. This interest amounts to 7½% of the profits which is to be divided 3¾ percent to Wortman and 3¾ percent to Moore. If, at a later date, the percentage of interest in the Hyde Park Club is increased to Moore the profits will still be divided on a 50-50 basis, i. e., ½ to Wortman and ½ to Moore; but the name of Wortman shall not appear on the original partnership agreement of the Hyde Park Club at any time.

"Gregory E. Moore acknowledges herewith receipt of $5,000.00 in cash from Frank Wortman on July 1, 1944.

"Frank Wortman acknowledges now that he received $6,910.14 during the year 1944 from Gregory E. Moore as profits from the Hyde Park Club; and Frank Wortman acknowledges that he received from Gregory E. Moore $7,872.75 as profits from the Hyde Park Club for the year 1945.

"This agreement dated as of January 10, 1946, as a Nunc Pro Tunc agreement for verbal agreement of July 1, 1944.

"This agreement can be terminated by either party on ten (10) days notice verbal or written.

"Signed by Frank Wortman and Gregory E. Moore. Witnessed by John W. Joynt and Mrs. Gregory E. Moore."

The correspondence between Long and Moore, together with the Moore-Wortman agreement produced by Moore, were admitted in evidence over defendants' objection that they were incompetent as hearsay and immaterial as to all defendants other than Moore. It is at once evident that these exhibits, particularly the agreement, if erroneously admitted were highly prejudicial. The conspiracy is alleged to have commenced July 1, 1944, the date on which the agreement became effective by reason of its Nunc Pro Tunc provision. The agreement constitutes the foundation upon which the Government's case is based insofar as it relates to conspiracy. It permeates and colors the picture during the entire period of the alleged conspiracy. A study of the Government's brief affords abundant support for this appraisal.

The Government commences its statement of facts under the heading, "The starting point of the conspiracy—Hyde Park Agreement," and as to that business relies entirely upon the Moore-Wortman

agreement and the use to which it was put by Moore in his controversy with the Revenue Service. In its summary of argument, the Government states:

"The evidence established that the appellants entered into a written agreement in January, 1946, to confirm their oral agreement of June 1, 1944, the gist of which was that the fact that Wortman had a financial interest in the Hyde Park Club would be concealed from the Internal Revenue Service."

Again it states:

"As we have shown, the appellants entered into a written agreement on January 10, 1946, to confirm the terms of their oral agreement of July 1, 1944, which provided that (1) the financial interest of Wortman in the Hyde Park Club would not appear on the partnership records 'for obvious reasons'; (2) Wortman's interest would be concealed under that of Moore and the two would share equally in that portion of the Club's profits which ostensibly belonged to Moore; (3) Wortman's name would not appear on the partnership agreement at any time; and (4) 'the interests of both Wortman and Moore will be carried in the name of Gregory E. Moore * * * as reported to the United States Government, Bureau of Internal Revenue.' The appellants abided by this agreement and none of the annual partnership returns of the Hyde Park Club disclosed Wortman's interest. It was not until mid-1950 that Moore, faced with a $30,000 tax deficiency after an investigation of his own tax returns by Treasury agents, disclosed the agreement with Wortman as proof that he (Moore) had been justified in reporting only 50% of his ostensible profits in the venture."

In its argument that the evidence established a single rather than separate con-

spiracies as contended by defendants, the Government states:

"Wortman and Moore, by reason of their knowledge of the plans' essential features and general scope, as shown by their Hyde Park agreement, were joined together by that knowledge and by their single common goal."

In response to defendants' statement that "there is no evidence at all that appellant Moore had any connection with appellant Wortman during the period from 1947 to 1953," the Government states:

"Indeed, though Moore was temporarily absent from the conspiracy during these years, he later became a key figure in the gambling casino, and as we have shown, his conduct at that time in furtherance of the conspiracy clearly reveals that he never intended to terminate his express agreement with Wortman to defraud the revenue."

Finally, in support of its theory of a continuing conspiracy, the Government states:

"To begin with, the express terms of the 1946 written agreement showed that appellants had already devised a scheme to prevent the Internal Revenue Service from learning that Wortman had an interest in the Hyde Park Club."

Some of the circumstances leading up to Moore's supplying the Revenue agent with the Moore-Wortman agreement have already been shown. The original agreement was not produced, and both the Government and defendants denied having it in their respective possessions. There was testimony that a typewritten copy was made, with the original returned to Moore. A photostat of this typewritten copy was offered and admitted, without the slightest competent proof that defendant Wortman signed the agreement, that he directed or authorized it to be done on his behalf, or that he had knowledge of its contents.[1] Agent Long

---

1. 80 C.J.S. Signatures §§ 1, 2, page 1286, states, "The signature to a writing is

placed there for the purpose of authenticating it or to give notice of its source,

testified that he received from Moore "a signed agreement." He made no pretension of knowing or being familiar with the signature of Wortman; in fact, he was not questioned in that respect. There was not even testimony by the typist who made the copy as to whether the name of Frank Wortman on the original was in typewritten or handwritten form. In Moore's letter to Long, he stated that he was enclosing a copy of the agreement "that has been duly signed and witnessed." Obviously, this statement by Moore was not admissible against or binding on defendant Wortman. Moore's wife and his attorney, who purportedly witnessed the signatures, were not called as witnesses. Revenue agent Victor R. Glenn, a witness for the Government who disallowed Moore's claim, refused to recognize the Moore-Wortman agreement. The agent on cross-examination stated, "It was my contention that Mr. Wortman was not, and nobody has ever alleged that Mr. Wortman was, a partner in the Hyde Park Club."

We might determine on this record that defendant Wortman is a man of ill repute, but it taxes all credulity to believe that he is so deficient in mentality that he became a party to a written agreement with Moore that from then on he would conceal his assets from the Revenue Service and for two years previously had done so. It is not strange that the Government offered no proof that defendant Wortman signed the agreement and made no explanation as to why the Revenue Service refused to recognize it as bona fide.

■ The Moore-Wortman agreement was admitted against defendants Wortman and Moore without any reservation at a time when admittedly there was no proof of a conspiracy; in fact, it was offered for that purpose. It was a declaration by one alleged conspirator against another, made out of the latter's presence and without proof that he had in any manner authorized it. We cite a few of the many cases which have held such declarations inadmissible. Krulewitch v. United States, 336 U.S. 440, 443, 69 S.Ct. 716, 93 L.Ed. 790; Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; Carbo et al. v. United States, 9 Cir., 314 F.2d 718, 735; Dennis et al. v. United States, 10 Cir., 302 F.2d 5, 10; Tripp v. United States, 10 Cir., 295 F.2d 418, 422; Taylor v. United States, 104 U.S.App.D.C. 219, 260 F.2d 737, 738; Panci v. United States, 5 Cir., 256 F.2d 308, 311.

In Glasser, the Court stated:

"* * * such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof *aliunde* that he is connected with the conspiracy."

In Tripp, the Court stated:

"The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirators done or made in his absence. Such declarations are admissible against him only where there is proof *aliunde* of his connection with the conspiracy."

In Panci, the Court commented upon the prejudicial nature of testimony of an alleged co-conspirator admitted in violation of the rule, which is pertinent here:

"Leaving the hearsay testimony out of consideration destroys the case in fact. Taking it into consideration destroys it in law."

and for the purpose and with the intent that the individual signing the writing shall be bound thereby," and on the following page, "A signature may be made by the purported signer himself * * * or through someone duly authorized by him, but the name of a person attached to a paper does not make it his act and

deed unless he put it there himself or caused or permitted it to be put there by another." See Roberts v. Johnson et al., 10 Cir., 212 F.2d 672, 674, and Joseph Denunzio Fruit Co. v. Crane et al., D.C., 79 F.Supp. 117, 128 (footnote), affirmed 9 Cir., 188 F.2d 569, 570.

The trial court recognized the rule by instructing the jury:

"In considering whether or not a particular defendant was a member of the conspiracy, you must do so without regard to and independently of the statements and declarations of others."

The Government in its argument that the testimony under discussion was properly admitted states:

"If the appellants became members of a conspiracy on July 1, 1944, to conceal material facts from the Internal Revenue Service—as we submit they obviously did—there is certainly no substance to the argument that proof of that agreement and the activities which followed it should have been excluded from evidence."

In the abstract, we see nothing wrong with this argument, but it is beside the issue. The point is that at the time the Moore-Wortman agreement as well as the other exhibits which we have discussed were admitted, there was no proof *aliunde* of a conspiracy. The agreement was admitted to establish the conspiracy without proof that defendant Wortman was a party to it.

The income tax returns of both defendant Wortman and Moore disclose that as early as 1944 there was some arrangement between them by which the latter was to pay to defendant Wortman one-half of the profits which he received from the Hyde Park Club. Defendant Wortman in his 1944 tax return showed "Greg Moore" as the source of Hyde Park income. For some reason not disclosed, the Government did not offer defendant Wortman's tax returns for the years 1945, 1946 and 1947. Moore's returns for these years disclosed that he had paid to defendant Wortman one-half of the profits which he received as a partner in Hyde Park. A revenue agent testified that his investigation disclosed that defendant Wortman for each of the years 1944 to 1947, inclusive, had reported in his tax returns the same amounts which Moore had stated in his returns as having been paid. Such fact is no proof of a conspiracy to evade taxes or defraud the Government. More importantly, it is no proof that defendant Wortman entered into the Moore-Wortman agreement, and the Government does not so contend.

Assuming that the Government before the jury analyzed the Moore-Wortman agreement as it does here, its prejudicial effect is further emphasized. In its brief it states:

"While Wortman annually reported this income on his tax returns, both he and Moore, during these years, abided by their agreement and at no time disclosed to the Internal Revenue Service Wortman's financial interest in the Hyde Park partnership."

This assertion fails to distinguish between the Hyde Park partnership and the Moore-Wortman agreement. Defendant Wortman was not a partner in the former and thus had no financial interest therein to disclose. The Government states:

"The partnership returns of the Hyde Park Club for the years 1944 through 1947, inclusive, did not list Frank Wortman as a partner."

The uncontradicted proof is that he was not a partner. The Government asserts:

" * * * nor did either Moore or Wortman, despite the existence of their 'partnership agreement,' file or cause to be filed a partnership information return showing the distribution of this income."

Whether the law required them to do so is arguable. The Revenue Service in 1950 rejected Moore's claim that a partnership agreement existed. In any event, Moore filed his tax returns showing the amounts paid by him to defendant Wortman and the latter filed returns disclosing receipt. The Government asserts that defendant Wortman concealed the $5,000.00 cash which, according to the agreement, he paid to Moore, which "would naturally tend to frustrate an investigation of Wortman's net worth." This is a flimsy contention and its valid-

ity, if it has any, would depend upon a number of factors. Assuming that the net worth period commenced in 1944, the year of the payment, the alleged concealment would be to the Government's benefit rather than that of defendant Wortman. The fewer assets disclosed at the beginning, the more there would be at the end of the net worth period.

We think it pertinent to observe that the Moore-Wortman agreement was by its terms limited to the Hyde Park Club. The parties appear to have so recognized because Moore had no association with defendant Wortman from the time the Hyde Park Club ceased to exist in 1947 until 1953, a period of six years. The Government attempts to meet this situation by reliance upon the rule that once a defendant is shown to be a party to a conspiracy he remains so until he takes some affirmative step to disassociate himself from it. There is no case, however, so far as we are aware, where the alleged conspiracy was shown by an express agreement of the parties, which by its own terms fixed the time of termination and thereafter the parties pursued their own separate ways for a period of six years. Such being the situation, it is not discernible how the agreement can be relied upon as the foundation for a conspiracy which endured for sixteen years.

We now return to Moore's controversy with the Revenue Service, wherein he produced the Moore-Wortman agreement in support of his claim that he was entitled to credit on his gross income for payments made to defendant Wortman, allegedly by virtue of the agreement. This contention was denied by the Commissioner and a deficiency assessed against Moore which on appeal by Moore was sustained by the Tax Court. A settlement was afterward reached and a stipulation entered into between the Revenue Service and Moore by which the latter was given credit on his taxes for

the amounts he had paid defendant Wortman. In this way, the Government received some $18,000 more than it would have had it recognized the Moore-Wortman agreement, for the reason that Moore was in a higher income bracket than Wortman.

The Court over objection admitted against Moore and defendant Wortman a petition dated January 25, 1951, for a redetermination of Moore's income taxes for the calendar years 1945, 1946 and 1947, signed by John W. Joynt, counsel for Moore, as well as a stipulation entered into May 9, 1952, agreeing to and settling the amount of tax to be paid by Moore. The Court also admitted as against Moore and defendant Wortman three petitions signed by Moore, dated March 13, 1958, for refund of taxes paid by him for each of the years 1945, 1946 and 1947. We need not recite in detail the contents or allegations of these exhibits. It is sufficient to note that all were submitted in connection with Moore's contention that he was entitled to a reduction in the deficiency assessed against him by reason of the Moore-Wortman agreement, or to a refund of such taxes because of the Tax Court's refusal to recognize it. Typical of the material shown in these exhibits is the following allegation in his petition for a redetermination of the deficiency assessed against him:

"This partner [defendant Wortman] or joint-venturer owned jointly with petitioner a share in the enterprise in question and deposited with petitioner a sum of money, which sum was placed in the hands of petitioner and was to be used for financial purposes related to the enterprise, if and when necessary. These facts were known and agreed to by the other partners to the enterprise.[2] Upon the declaration of a dividend of the earnings of the part-

2. The Government on brief, citing this statement in Moore's petition, asserts, "The facts concerning the Moore-Wortman agreement were 'known and agreed to by' the remaining partners of the Hyde Park Club." This is an erroneous and misleading assertion. The statement in

Moore's petition was admitted only as to defendants Wortman and Moore and not as to other partners of the Hyde Park Club. The Government's statement does highlight the prejudicial nature of the admission of this testimony as to defendant Wortman.

nership, petitioner paid to his joint-venturer fifty per cent of the sum received on each of the years in question and said joint-venturer thereupon declared such payments as income and paid taxes thereon. The agents in charge of the St. Louis, Missouri, Division of Internal Revenue disallowed as deductions the said sums paid by petitioner to his said joint-venturer."

In our judgment, all of these exhibits which were read to the jury were highly prejudicial and erroneously admitted. In the first place, they were mere narratives by Moore of past facts, particularly as to the claims for refund filed some fourteen years after the occurrence. Logan et al. v. United States, 144 U.S. 263, 309, 12 S.Ct. 617, 36 L.Ed. 429. Secondly, they contained assertions by one alleged conspirator against another, with which the latter had nothing to do. Such declarations are inadmissible. (See cases heretofore cited in support of this rule.) Thirdly, they were not admissible against either Moore or defendant Wortman because they did not prove or tend to prove the charge as made; in other words, they were not relevant. In Fiswick et al. v. United States, 329 U.S. 211, 217, 67 S.Ct. 224, 227, 91 L.Ed. 196, the Court stated:

"* * * the act of one partner in crime is admissible against the others where it is in furtherance of the criminal undertaking * * *."

In Krulewitch v. United States, 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790, the Court stated:

"* * * it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule."

In Lutwak et al. v. United States, 344 U. S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593, the Court stated:

"But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy."

A study of the conspiracy charge is convincing that the declarations of Moore contained in his Tax Court proceeding were not in "furtherance of the objectives of the conspiracy." As we have noted, the objective of the alleged conspiracy was to aid defendant Wortman in one way or another in his tax matters. In brief summary, it was alleged that the defendants conspired to defraud the United States of income taxes owed by defendant Wortman; to defraud the United States in the exercise of its governmental function and right of ascertaining, computing, etc. the taxes owing by defendant Wortman; to assist defendant Wortman in the evasion and defeat of his income taxes; to conceal by trick, scheme and device material facts within the jurisdiction of the Internal Revenue Service; to keep false books and records so as to show their gambling operations in names other than defendant Wortman, and to cause to be prepared and filed false individual income tax returns of defendant Wortman.

Defendant Wortman, as far as the record discloses, was a stranger to Moore's Tax Court proceedings. He had no interest therein, financial or otherwise. The proceedings and the declarations of Moore contained therein were solely on Moore's behalf, made in an effort to obtain a reduction in his income tax deficiency. They bore no relation to tax matters with which defendant Wortman was concerned. Certainly the proceedings or any of the allegations made therein did not show a concealment by trick, scheme or device on the part of Moore or defendant Wortman. In fact, all of Moore's activities with reference to his tax matters under discussion were the very antithesis of secrecy or concealment. They were all in the open, spread upon the records of the Revenue Service. We think there is no escape from the conclusion that Moore's petition for a reduction in his tax deficiency, the stipulated settlement agreement and his claims for refund bore no relevancy to the charge of conspiracy as made. They were erroneously admitted as to both de-

fendant Wortman and Moore, and were particularly prejudicial to the former.

In view of what we have heretofore shown, it is evident that the Government relies upon its proof relative to National Amusement Company and Plaza Amusement Company on the premise of a going conspiracy. As we have held, its reliance on its proof relative to the Hyde Park Club is misplaced. However, inasmuch as the proof regarding these three businesses was admitted solely on the charge of conspiracy, and National Amusement and Plaza were operated within the same period of time as Hyde Park, we shall briefly discuss them. In doing so, it is pertinent to note that Moore was in active charge of National Amusement and Plaza, as he was in Hyde Park. Defendant Wortman had no interest in Hyde Park, owned 14% of the shares in National Amusement and 20% in Plaza.

### THE NATIONAL AMUSEMENT COMPANY.

On December 12, 1944, Moore purchased from one Peter Brandt for a price of $22,500 all of the outstanding stock in National Amusement Company, a corporation engaged in the operation of phonographs and amusement devices. Shortly thereafter (the record does not disclose the exact date), Moore, defendant Wortman, Edward Wortman, Elmer Dowling, Thomas A. Pagan, Louis C. Smith, Barney Barts and Frank O'Mara (the last four named not alleged to be conspirators) organized the "Gregory E. Moore, et al., partnership," to which the shares purchased from Brandt by Moore were transferred.

On March 15, 1945, the National Amusement Company was incorporated, the stock of which was owned by the Gregory E. Moore, et al., partnership. Moore as President-Treasurer of the company caused a corporate tax return to be filed for the year 1945. No return was made by the partnership for the year 1944, and in the 1945 corporate return Moore answered, "No," in response to a question, "Did any * * * partnership * * * own at any time during the taxable year 50% or more of the corporation's voting stock?"

In 1945, Moore in his individual capacity brought suit against Brandt from whom the stock in National Amusement Company had been purchased, alleging fraud, for the purpose of forcing Brandt to repurchase the stock. On April 25, 1946, by reason of a settlement agreement, Brandt repurchased the stock for $112,500. The purchase price, at Moore's request, was paid to him in the form of checks, each dated April 25, 1946. The largest check was in the amount of $89,-172.42; the other four checks were last endorsed by the National Amusement Company and Brandt could not recall whether these checks were redeposited to his account or to that of National Amusement Company. Moore received the amount of the largest check in cash. In 1946, Moore filed a tax return on behalf of the corporation, which disclosed the purchase price of the stock, its sale price, the gross long term capital gains and the capital investment. This return named the partners and the amount of the capital investment and net long term capital gain for each. Shortly after making this return, checks were drawn by Moore, payable to the Internal Revenue Service, for the capital gains tax of each of the eight partners.

The Government argues:

"While each check purported to pay the tax on the distributive share received by that member of the partnership, it was the position of the Government that Moore and Wortman had engaged in a course of conduct designed to prevent the Internal Revenue Service from ascertaining the amounts actually received by each partner."

It seems to us that the inference of concealment is dispelled by the fact that in March 1947, a partnership return signed by Moore was filed for the year 1946. The Government concedes that by this return it was furnished the desired information. In its brief it states:

"This partnership return disclosed to the Internal Revenue Service for

the first time, the financial interest of both Moore and Wortman in the National Amusement Company."

Thus, in March 1947, the parties revealed what the Government infers they concealed in 1946.

The Government offers much documentary evidence purportedly to show the concealment of assets by Moore and defendant Wortman in connection with the operation of the National Amusement Company, which in the main rests upon the premise that Moore paid Brandt $22,500 for the stock, shortly afterward sold it back to Brandt for $112,500, and that in some way this profit was not accurately accounted for. In its brief it states, "At least $54,000 of the proceeds of the sale had been withdrawn from Moore's bank account and disappeared from view." The Government without proof indulges in the dubious inference that this money was received by defendant Wortman.

This argument, in our view, is completely annihilated by information elicited on cross-examination of Government's witness Brandt which, we hope inadvertently, is not mentioned either in the Government's statement of facts or in its argument. Brandt testified as follows:

"Q. Now, with reference to—you said that you sold this company for, I believe you testified, $22,500?

"A. Right.

"Q. Was that twenty-two thousand, was that the entire price or was there some indebtedness?

"A. There was indebtedness.

"Q. How much indebtedness?

"A. I would say approximately ninety thousand.

"Q. Approximately ninety thousand dollars?

"A. Yes."

Brandt made it plain that when he testified that he received from Moore $22,500 for the sale of the stock he was referring to cash received, with the indebtedness assumed by Moore. When he re-

purchased the stock from Moore for $112,500, it was free and clear of indebtedness. Brandt did not specifically know who cleared the indebtedness or in what manner. He testified, however, that under his agreement with Moore he was to receive the property free and clear, that Moore promised to take care of the indebtedness and that Brandt later ascertained that it had been paid. Thus, the purchase of the stock in National Amusement Company by Moore for $22,500, with a company indebtedness of $90,000, and its resale by Moore to Brandt for $112,500, cleared of all indebtedness, indicates there was no profit in the transaction. It also should be remembered that defendant Wortman was not shown to have had anything to do with the activities of National Amusement Company other than to own 14% of its stock. He was not responsible for the activities of Moore, absent proof of a going conspiracy.

### THE PLAZA AMUSEMENT COMPANY.

On March 1, 1947, Plaza Amusement Company was incorporated. It was an operating company for phonographs, pinball, pool and shuffleboard games. The company had previously operated as a partnership from May 1, 1946, consisting of the eight partners, including defendant Wortman and Moore, who had been stockholders in National Amusement Company. The corporation issued 250 shares of stock (par value $100) fully paid, for a total capitalization of $25,000, the stock being issued to and held as follows: 50 shares each by Dowling, Barts and defendant Wortman; 33 shares each by O'Mara, Smith and Edward Wortman, and 1 qualifying share by Edward Heiby, attorney for the corporation. It may be noted that no stock was issued to Moore and it appears that he had no connection with the corporation. In fact, as previously noted, Moore at that point dropped out of the picture and had no connection with defendant Wortman until some six or seven years later.

The cash receipts book and general ledger of the corporation disclose that

during the period from March 22, 1947 to October 9, 1947, inclusive, a total of $98,400 was loaned by the stockholders to the corporation. The Government states that according to the corporate records $68,170 of this amount was loaned to the corporation by its attorney, Heiby, who was the owner of only one share of stock. This statement is hardly accurate. What the record shows is that the cash receipts book in connection with this loan noted "Heiby," which might mean the loan was made by him or by some other party through him. Otherwise, the proof does not disclose who advanced the loans.

On October 21, 1947, the loan accounts in the amount of $98,400 were closed out and the liability transferred to the capital account. A Revenue agent who was a Government witness, with reference to this transfer testified, "It was not taxable when placed in stock. It was an investment in capital." On the same date the loan accounts were transferred to capital, an additional 1000 shares of capital stock of the corporation of the par value of $99,900 were issued to the existing stockholders as follows: 200 shares each to Dowling, Barts and defendant Wortman; 133 shares each to O'Mara, Smith and Edward Wortman, and 1 share to the bookkeeper, Ann Barrett, for which she was charged $100. Thereafter from October 1, 1947 to August 31, 1948, additional sums were advanced to the corporation and carried in the general ledger as loans from its stockholders, without designating which stockholder or stockholders made such loans. In August 1949, the balance remaining in the "Loans Payable Stockholders" account totaled $40,600. By August 31, 1950, the account was closed out by the issuance by the corporation of four checks, three of which were made payable to four individuals and endorsed by all, without disclosing the amount received by each.[3]

The Government concludes its statement relative to Plaza Amusement Company by summarizing the activities of the alleged conspirators up to early 1948. This summary again emphasizes the Government's dependence upon the Moore-Wortman agreement allegedly entered into in connection with the Hyde Park Club. In its brief, referring to the Hyde Park Club, it states:

"Wortman's cash investment therein together with his interest in the Hyde Park profits for the years 1944 through 1947, had not been disclosed to the Internal Revenue Service in accordance with his agreement with Moore."

The Government reiterates its theory relative to National Amusement Company, which we have heretofore discussed, and again ignores the fact that a company indebtedness of approximately $90,000 was discharged as a part of the transaction in connection with which Brandt paid Moore $112,500 for the stock.

The Government emphasizes two circumstances in connection with Plaza Amusement Company: (1) that the books did not disclose the amounts loaned to the corporation by the respective stockholders, and (2) that the distribution of the balance of the corporate funds was made by checks in such a manner that it could not be determined the amount received by each. As already noted, the loans made by the stockholders were transferred to capital which, according to the testimony of a Revenue agent, was a non-taxable investment. It may be recalled that Moore was not a stockholder in Plaza Amusement Company and that defendant Wortman both before and after the stock increase owned 20% of its shares. It is a dubious inference from the manner of the distribution that 80% of the shareholders were engaged in concerted action to aid de-

---

3. Sometime during the period under discussion Barts and O'Mara, original stockholders, disposed of their shares to the corporation or other stockholders. George Frank, the accountant for Plaza Amusement Company, was unable because of a physical disability to appear as a witness, and Edward Heiby, attorney for the corporation, died October 5, 1947.

fendant Wortman in tax evasion or in concealing assets from the Revenue Service. Moreover, the income tax returns of defendant Wortman for the years in question were in possession of the Government but not offered in evidence. It would seem that the Government, with knowledge of the amount distributed to the shareholders, could have determined from defendant Wortman's tax returns whether he accounted for his proportionate share.

In view of what we have held, no good purpose could be served in stating or discussing the situation as it relates to the Paddock Restaurant and the Premier Club (also referred to as the Peerless Club and the Paramount Club). The operation of these businesses followed those which we have discussed. They involved a different period of time, and in the main different persons were connected with their operation. Whether the evidence as to them shows a conspiracy and, if so, the parties thereto, and whether it was a different conspiracy from that alleged or a continuation thereof, are questions which we need not decide. Numerous other contentions advanced by defendants need not be resolved. Our exhaustive study of this voluminous record bolsters our appreciation of the statement in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, by Mr. Justice Jackson (concurring opinion):

"As a practical matter, the accused often is confronted with a hodge-podge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559 [68 S.Ct. 248, 257, 92 L.Ed. 154], all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co. [2 Cir.], 167 F.2d 54."

That statement could have been written for this case. With an indictment difficult to comprehend because of its verbosity; with voluminous exhibits, many of a technical nature; with evidence admitted on promise by the prosecutor that it later would be connected and with the jury left to make the determination; and with a trial that lasted six weeks, it is a matter of grave doubt as to whether the verdict reached after four days of deliberation resulted from a proper appraisement of the record, confusion or exhaustion.

Nothing we have said is any reflection on the manner in which the case was tried by Judge Juergens. We doubt if any other Judge could have done better. The unfortunate situation arises from the inherent nature of the crime of conspiracy, particularly as it was sought to be employed by the Government in this case.

We hold that the evidence which we have previously discussed was erroneously admitted. The error was prejudicial inasmuch as it was calculated to produce a substantial influence on the jury verdict. As was stated in Krulewitch v. United States, 336 U.S. 440, 444, 69 S.Ct. 716, 718, 93 L.Ed. 790:

"In Kotteakos v. United States, 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557], we said that error should not be held harmless under the harmless error statute if upon consideration of the record the court is left in grave doubt as to whether the error had substantial influence in bringing about a verdict. We have such doubt here."

The judgments are reversed and the cause remanded.